[Crim. No. 17352. Second Dist., Div. Two. Dec. 14, 1971.]

THE PEOPLE, Plaintiff and Respondent, v.
ANTONIO GEORGE AMADIO et al., Defendants and Appellants.

## COUNSEL

Donald F. Roeschke, under appointment by the Court of Appeal, for Defendants and Appellants.

Evelle J. Younger, Attorney General, William E. James, Assistant Attorney General, and William R. Pounders, Deputy Attorney General, for Plaintiff and Respondent.

## OPINION

**ROTH, P. J.**—Amadio, Kaldenberg, Scalvace and Sinatra were convicted of conspiracy (Pen. Code, § 182) to receive stolen property (count I) and of receiving stolen property (Pen. Code, § 496), as alleged in counts III, IV and V.[1] As to Amadio, Kaldenberg and Scalvace, execution of the sen-

---

[1]As to each appellant, count II was dismissed and they were found not guilty of count VI.

tences on counts IV and V was stayed,[2] they were sentenced to state prison, and now appeal from the judgments of conviction. Sinatra appeals from the judgment (order granting probation) on counts I, III, IV and V.

During the course of two burglaries of the Reese Drug Store in St. Charles, Missouri in November 1967, six books of money orders were taken, each book having a maximum value of $2,000. In February 1968 the Buehler Brothers Supermarket of Chicago Heights, Illinois was burglarized and a large number of American Express Money Orders together with the appropriate imprinting equipment, as well as cash and payroll and personal checks, were stolen; and in September 1966 approximately $375,-000 in unissued Series E Bonds, certificates of deposit and other properties were stolen in the burglary of the Belle State Bank of Belle, Missouri. The properties stolen on these three occasions formed the bases of counts III, IV and V, respectively, to wit: the money orders (III), the American Express Money Orders (count IV) and the Series E Bonds together with other properties (V). Count I charged a conspiracy of the receipt of items of stolen property which extended to "stolen money orders, Series E United States Government Savings Bonds, travelers checks, . . . certificates of deposit, real estate deeds, stock certificates, jewelry, gold, and other items . . ."and thus was of broader scope than counts III, IV or V, taken singly. As will be seen below, this fact, conceded by appellants, vitiates their argument that the imposition of sentences on counts I and II amounted to double punishment.

Appellant Sinatra met Clarence Baumgarten, age 81, in May 1968. Baumgarten, convicted in 1962 and 1967 of grand theft, was, unbeknownst to Sinatra, a paid informant utilized by various law enforcement agencies in the recovery of stolen property. Baumgarten arranged a meeting in early June between Sinatra and Sergeant Roberson of the Los Angeles police. Roberson whose real identity was, of course, known to Baumgarten, appeared at the first meeting which was held in a television studio in Los Angeles as an airplane pilot and brother-in-law of Baumgarten.

At a meeting, during which Baumgarten played the part of a "wealthy T.V. producer," Sinatra represented to Roberson that he could get gold, diamonds, counterfeit money, bonds, in fact anything that was desired, that he had a couple of good cat burglars working for him, and that he had an uncle who was a member of the Mafia. Specifically, Sinatra agreed to show samples of American Express Money Orders and furs, a promise which he redeemed next day by displaying two money orders and five mink stoles which he stated were "hot" but which wouldn't show up on a "hot sheet"

---

[2]The clerical error relating to permanency of the stay is corrected in our order.

for at least two weeks. (A check revealed that the money orders in question had been reported stolen, apparently from the Reese Drug Store (count III).)

At a third meeting on June 13, 1968, Sinatra told Roberson and Baumgarten that he had $375,000 worth of stolen Series E Bonds (count V). Sinatra was paid $175 on this occasion for the furs to show that Baumgarten and Roberson were capable of paying for other merchandise.

Next day, Baumgarten and Roberson met with Sinatra and a (nonappealing) co-defendant Rosner, at a residence selected for its pretentiousness, purportedly Baumgarten's. Fifteen thousand dollars worth of stolen money orders were discussed, and the possibility of a future deal extending to 15 million dollars of stolen money orders was suggested by Rosner. Baumgarten, declining to "fool" with the former small amount, got a commitment with Roberson's assistance for the 15 million dollar "package" which Sinatra said would be flown in from Florida on a Lear jet that night. Sinatra, Scalvace and Rosner were to receive 20 percent of the face amount of the money orders.

The residence was staked out by FBI agents and Los Angeles police until midnight but no one appeared. The following day at 9 a.m., Sinatra and Rosner delivered $16,000 of American Express' and Consumers' money orders which had been taken in the Reese Drug Store burglary. (Count III.)

On June 18, Sinatra appeared at Baumgarten's, stating that the Lear jet had been lost, and that there were $375,000 of "bare faced" bonds at the "bottom of the hill." Baumgarten agreed to pay 40 percent (of the face value) and Sinatra left to return later with Kaldenberg whom he introduced as the "big man . . . the one we have to satisfy." Kaldenberg, in turn, stated to the assemblage: "Now, we're going to get right down to business. We have $375,000 worth of stolen bonds, and how do we know that we are safe and you are not the police?" After a sharp exchange, Kaldenberg, mollified but not reassured, left, saying that if Baumgarten and Roberson were the police there would be a lot of bodies lying "all over the place" on his return.

Sinatra and Kaldenberg reappeared within 15 minutes, accompanied by a third man (Swinehart). Roberson, fearing a gun battle because of Kaldenberg's last statement, arrested all three men. Several other policemen were in and outside the house at this moment. Scalvace and Rosner were located at the nearby Carolina Pine's Restaurant, arrested and brought to Baumgarten's.

Ignition keys identified by Roberson as belonging to a sports car were

found on the seat in the house which had been occupied by Kaldenberg's companion Swinehart. A search for the car which fit the keys was made unsuccessfully at the Carolina Pines Restaurant but the vehicle was finally found by Roberson on June 21 four blocks from the restaurant. After having placed the car under surveillance, Roberson left to get a search warrant but in any event never returned to the vehicle.

The vehicle in question had been transferred by one Stanton to Gram upon the latters' agreement to make the payments thereon. Gram,[3] in turn, had shared the car with Kaldenberg, the latter having the car approximately 90 percent of the time. Gram, upon his arrest on June 21, gave his written consent for the search of the car. That search revealed the Series E Bonds taken during the Belle State Bank burglary (count V) as well as other properties.

While, as we have seen, appellants Kaldenberg, Scalvace and Sinatra were attempting to sell the contraband to Baumgarten and Roberson, their confederate and co-appellant Amadio was trying to sell all and/or part of the same money orders, checks and securities to Jimmie Anderson, a real estate and hotel consultant.

Anderson had been introduced to Amadio by Irving Richards, an investigator retained by the Bank of America. Richards, working undercover, had met Amadio in April 1968 in an effort to buy some counterfeit Bank of America travelers checks. The contact had proven to be unproductive but in June 1968, after some preliminary contacts, Amadio approached Anderson with some bonds and a list of stolen securities which were for sale. Anderson turned the papers over to Richards who had them checked by the Los Angeles Police Department and then returned them to Anderson, who was working in tandem with the police. In the afternoon of June 18, the bonds and papers were returned to Amadio—at a moment roughly contemporaneous with Kaldenberg's, Scalvace's and Sinatra's arrests.

On the night of the same day, June 18, Amadio called Anderson and asked him to find out if there had been any arrests since "some of the men" were overdue at the hotel by four and a half hours. Amadio mentioned Swinehart specifically, stating that if he was in jail he had to be freed since he was the only one who knew where the stocks and bonds in the amount of $400,000 were. (The keys to the car containing the bonds had fallen from Swinehart's pocket—or had been dropped by him onto the seat in the Baumgarten house.)

---

[3]Gram was not charged in the indictment and the disposition of the charge, if any, against him does not appear from the record. Nancy Stanton was the registered owner of the vehicle.

On June 20, Anderson picked up Amadio at the Ramada Inn, where the latter had been staying and drove to a location where they were eventually met by two confederates who handed Amadio an envelope containing American Express Money Orders which Anderson had agreed to buy from Amadio. Returning to the Ramada Inn, Anderson viewed the books of money orders (later identified as those taken from Buehler Brothers Supermarket—count IV) for which he was to pay $5,000. By a pre-arranged signal, Anderson notified the police, who promptly moved in and arrested Amadio and two confederates (Hall and Harmon).

The reception clerk at the Ramada Inn testified that Kaldenberg and Swinehart had been staying at the Inn in June 1968; that payment for their room had been made by a credit card in the name of Amadio; that Sinatra had been at the Ramada Inn; that Amadio and Swinehart had stayed in the same room; and that she had seen Kaldenberg with Swinehart on numerous occasions in the coffee shop.

Each of the appellants contends that the evidence as to him is insufficient to sustain the conviction. Guided by the familiar rule (*People* v. *Redmond,* 71 Cal.2d 745, 755 [79 Cal.Rptr. 529, 457 P.2d 321]), we must reject this contention, especially in light of the overwhelming evidence of guilt. It was Kaldenberg, identified as the man to be "satisfied" by the conspirators, who stated that they had $375,000 in stolen bonds, who demanded to get down to business, and who threatened murder if Baumgarten and Roberson turned out to be policemen. As to Amadio, the evidence shows that he was in the process of selling stolen American Express Money Orders to Anderson when he was arrested, that he was worried about Swinehart since only the latter knew the location of the Series E Bonds (Amadio had shown Anderson some of the Series E Bonds) and that he had negotiated at great lengths with both Anderson and Richards in his efforts to dispose of stolen securities, bonds and other contraband. Sinatra, of course, operated as the front man and it is superfluous to resummarize the extensive evidence which conclusively incriminates him. (After his arrest, Sinatra offered to cooperate with the police in the search for the bonds.) Scalvace, arrested with Kaldenberg and Sinatra at the Baumgarten house, participated actively in the negotiations between Baumgarten-Roberson and Sinatra for the 15 million dollars worth of money orders and was identified to Baumgarten by Sinatra as one of his confederates. Finally, the evidence shows that each of the appellants associated with the others during the high tide of the conspiracy—June 1968— at the Ramada Inn, that they knew of and actively participated in the conspiracy, and that, as illustrated by Amadio's concern over Swinehart's whereabouts, their "merchandise" was pooled.

■ Appellants contend that an instruction outlined in the concurring opinion in *Sherman* v. *United States,* 356 U.S. 369, 384 [2 L.Ed.2d 848, 857-858, 78 S.Ct. 819] concerning the defense of entrapment, should have been given. The instructions on entrapment, as given in this case (CALJIC Nos. 852, 854), have recently been approved in substance in *People* v. *Moran,* 1 Cal.3d 755, 760-761 [83 Cal.Rptr. 411, 463 P.2d 763], were requested by appellant Sinatra and were not objected to below. The doctrine of waiver applies. (*People* v. *Harrison,* 1 Cal.App.3d 115, 121 [81 Cal.Rptr. 396].) Moreover, a concurring opinion is not the opinion of the court and is not binding.

■ It is contended that Gram's consent to the search of the vehicle was legally ineffective since Kaldenberg had been in possession of the vehicle for some time. However, the record shows that Gram was making payments on the car and that he *shared* the vehicle with Kaldenberg, albeit on an unequal basis. At most, Gram and Kaldenberg were in a position analogous to co-tenants of physical premises; it is axiomatic that co-tenants may consent to the search of areas on premises which are jointly used and occupied. (*People* v. *Terry,* 57 Cal.2d 538, 558-559 [21 Cal.Rptr. 185, 370 P.2d 985].) Moreover, a reasonable and good faith belief, fully supported in the case at bench, that the individual giving consent is the owner and can give consent is sufficient basis for the police to act upon the consent given. (*People* v. *Gorg,* 45 Cal.2d 776, 783 [291 P.2d 469].)

■ Appellants challenge the constitutionality of Penal Code section 497, which equates the receiving of stolen property in another state, once it is brought into California, to receiving stolen property in California in violation of section 496. Section 497 has been found valid on a continuing trespass theory in *People* v. *Case,* 49 Cal.2d 24, 28-29 [313 P.2d 840], and appellants' argument has been rejected in *Case* as well as in *People* v. *Botkin,* 9 Cal.App. 244, 250-251 [98 P. 861].

Next, appellants contend that they should have been permitted to question Rosner (present during some of the Baumgarten-Sinatra negotiations) to show that they had done everything possible to call all persons present during the alleged conspiracy. However, the record reflects that Rosner was called by the defense but that he did not testify after being sworn on advice of counsel. Since he was called and appeared, appellants' purpose was met. Rosner could, of course, validly refuse to testify. (*People* v. *Bartges,* 126 Cal.App.2d 763, 771-772 [273 P.2d 49].)

■ The decision not to use certain allegedly impeaching evidence (as to Richards' testimony) is assigned as error indicating incompetent counsel. The evidence consists of letters throwing doubt on Richards' claimed status as an investigator for Lou Bennett and Associates. It is difficult to imagine

in what manner Richards' employment status, or the lack thereof, could have affected Anderson's testimony. The matter of impeachment is one for trial counsel's discretion. (*People* v. *House*, 12 Cal.App.3d 756, 766 [90 Cal.Rptr. 831].) In the same vein, it is urged that one Kaufman, whom Amadio met in prison after his present conviction, should be subpoenad "to support his appeal" since Kaufman can prove Amadio's innocence. This completely frivolous point, presented on Amadio's behalf by appellate counsel, must be rejected, if only because it is patently beyond the scope of the record.

Finally, it is contended that since the conspiracy (count I) had the same objective as the other offenses charged (counts III, IV and V), appellants cannot be punished for both the conspiracy and the other offenses. (*In re Cruz*, 64 Cal.2d 178, 180 [49 Cal.Rptr. 289, 410 P.2d 825].) Significantly, it is conceded that ". . . the list of stolen property in the conspiracy count is broader than that charged in the receiving stolen property counts . . . ." Such a concession vitiates appellants' argument. Appellants were not being punished for a conspiracy which had as its only objective the commission of the other offenses charged. (*In re Cruz, supra,* at pp. 180-181.) The conspiracy was wider and included, in terms of Sinatra's statements, gold, jewelry, counterfeit money, the future services of a "couple of good cat burglars" and, as merchandise delivered, mink stoles, to name some examples. Under these circumstances, it is patent that punishment for the conspiracy was not an impermissible duplication of punishment for the offenses charged in counts III, IV and V.

The judgments as to Amadio, Kaldenberg and Scalvace are corrected to provide that the execution of the sentences on counts IV and V are stayed pending service of sentence on counts I and III, the stay to become permanent thereafter as to both counts IV and V.

As corrected, the judgments are affirmed.

Herndon, J., and Fleming, J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied February 10, 1972.