[Civ. No. 2623. Fifth Dist. Sept. 8, 1975.]

JOE ROSATO et al., Petitioners, v.
THE SUPERIOR COURT OF FRESNO COUNTY, Respondent.

198

## COUNSEL

John J. Hamlyn, Douglas T. Foster, Fullerton, Lang, Richert & Patch, Philip C. Fullerton, Jeff Wall, Irwin & Thuesen and Donald H. Glasrud for Petitioners.

Arnold & Porter, Mitchell Rogovin, Downey, Brand, Seymour & Rohwer and John F. Downey as Amici Curiae on behalf of Petitioners.

Robert M. Wash, County Counsel, Max E. Robinson, Assistant County Counsel, Charles E. Moore and Thomas J. Riggs, Deputy County Counsel, for Respondent.

## OPINION

**BROWN, (G. A), P. J.—**

### INTRODUCTION

Petitioners, Joe Rosato and William K. Patterson, reporters, George F. Gruner, managing editor, and Jim Bort, city editor, all employed by Fresno's largest daily newspaper, The Fresno Bee,[1] seek a writ of review

[1] The Fresno Bee is owned and published by McClatchy Newspapers, a corporation, and has a general circulation in Fresno, Madera, Kings and Tulare Counties.

to annul orders of respondent court adjudging them in contempt for refusing to answer questions put to them and committing them to jail[2] until such time as the questions are answered.

The witnesses' refusal to answer is grounded upon the provisions of Evidence Code section 1070,[3] commonly referred to as the "shield law," and upon the First Amendment to the United States Constitution and the analogous provision contained in article I, section 2 of the California Constitution.[4]

This cause has received widespread publicity and comment and the proper resolution of the issues is of more than routine importance to the public, to criminal defendants, to the press[5] and to the courts.

### Synopsis of Facts

In October of 1974 the Fresno County Grand Jury jointly indicted Fresno City Councilman Marc Stefano, land developer Julius Aluisi and former City of Fresno Planning Commissioner Norman Bains on counts of bribery and conspiracy. Because of the prominence of the defendants and the nature of the charges, the incident generated extensive public interest and discussion.

The original and four copies of the grand jury transcript were delivered by the court reporter to the county clerk, who in turn delivered one copy to the district attorney, one copy to the defendant Stefano, one copy to Paul Mosesian, attorney for defendant Aluisi, and one copy to Assistant Public Defender Hugh Goodwin, attorney for defendant Bains.

---

[2]Execution of the sentences has been stayed pending determination of this matter on appeal.

[3]Evidence Code section 1070, subdivision (a), provides: "(a) A publisher, editor, reporter, or other person connected with or employed upon a newspaper, magazine, or other periodical publication, or by a press association or wire service, or any person who has been so connected or employed, cannot be adjudged in contempt by a judicial, legislative, administrative body, or any other body having the power to issue subpoenas, for refusing to disclose, in any proceeding as defined in Section 901, the source of any information procured while so connected or employed for publication in a newspaper, magazine or other periodical publication, or for refusing to disclose any unpublished information obtained or prepared in gathering, receiving or processing of information for communication to the public."

[4]The First Amendment to the United States Constitution prohibits the making of any law "abridging the freedom of speech or of the press" and the equivalent provision in article I, section 2 of the California Constitution provides that "a law may not restrain or abridge liberty of speech or press."

[5]Throughout this opinion the word "press" is intended to include all media.

The original was retained in the county clerk's safe except when it was in the possession of the court.

On November 21, 1974, one day before the grand jury transcript normally would have become available to the public, the court, on motion of the three defendants pursuant to Penal Code section 938.1, subdivision (b),[6] ordered the grand jury transcript sealed until completion of all the defendants' trials. On the following day, November 22, 1974, pursuant to motion or concurrence of all of the defendants, respondent court issued and filed a protective order entitled "Order re Publicity" with regard to the three criminal defendants. That order, after reciting the necessity to protect the defendants' right to due process of law and to a fair trial and noting that "it further appearing to the Court that the dissemination by any means of public communication of any out-of-court statements relating to this case may interfere with the constitutional right of the defendants to a fair trial and disrupt the proper administration of justice . . .," directed that: ". . . no party to this action nor any attorney connected with this case as defense counsel or prosecutor, nor any other attorney, nor any judicial officer or employee, nor any public official, including but not limited to any chief of police, nor any sheriff, nor any agent, deputy, or employee of any such person, nor any grand juror, nor any witness having appeared before the Grand Jury in this matter, nor any person subpeonaed [*sic*] to testify at the trial of this matter, shall release or authorize the release for public dissemination of any purported extra-judicial statement of the defendants or witnesses relating to the case, nor shall any such person release or authorize the release of any documents, exhibits, or any evidence, the admissibility of which may have to be determined by the Court, nor shall any such person make any statement for public dissemination as to the existence or possible existence of any document, exhibit, or any other evidence, the admissibility of which may have to be determined by the Court. Nor shall any such persons express outside of court an opinion or make any comment for public dissemination as to the weight, value, or effect of any evidence as tending to establish guilt or innocence. Nor shall any such persons make any statement outside of court as to the nature, substance, or effect of any testimony that has been given. Nor shall any such persons issue any statement as to the identity of any prospective witness, or his probable testimony, or the effect thereof. Nor

---

[6]Penal Code section 938.1, subdivision (b), provides in pertinent part: "If the court determines that there is a reasonable likelihood that making all or any part of the transcript public may prejudice a defendant's right to a fair and impartial trial, that part of the transcript shall be sealed until the defendant's trial has been completed."

shall any person make any out-of-court statement as [to] the nature, source, or effect of any purported evidence alleged to have been accumulated as a result of the investigation of this matter. Nor shall any such person or witness, whether or not under subpoenas [*sic*], make any statement as to the content, nature, substance, or effect of any testimony which may be given in any proceeding related to this matter, except that a witness may discuss any matter with an attorney of record or agent thereof."[7]

Defendant Stefano's motion for change of venue in the criminal matter was granted on January 3, 1975, and a like motion was granted upon the motion of defendant Aluisi on January 7, 1975. Defendant Bains' criminal trial was never transferred from Fresno County.

Notwithstanding the knowledge of petitioners Rosato and Patterson as to the existence and content of the seal and protective orders, there appeared on the front page of The Fresno Bee on January 12, 13 and 14, 1975, stories under their by-lines which quoted extensively from the sealed grand jury transcript.

It appearing to the respondent court that there had been a violation of the court orders, the court directed the county counsel to represent the court[8] in further proceedings concerning the apparent violation of its orders and set a hearing for January 24, 1975. The court asserted that the purpose of the hearing was (1) to punish disobedience of the court's orders by those subject thereto and (2) to perfect a record pertaining to pretrial publicity which the court characterized as an issue likely to be raised on appeal. The hearings were held on January 24 and 27, February 6, April 21 and 23, 1975.

Petitioners Rosato, Patterson and Gruner were served with a subpoena duces tecum directing them to produce at the hearings any copy of the grand jury transcript which they might have in their possession or under their control. A motion to quash the subpoena was filed by their counsel, and, in support thereof, the declarations of petitioners Patterson and Rosato stated that they did not have in their possession or under their control a copy of the grand jury transcript. The declaration of petitioner Gruner, though not denying that he had in his possession or under his

---

[7]For simplicity, the persons subject to the court order will hereinafter be referred to collectively as "court officers."

[8]Government Code section 27647 authorizes the county counsel to represent a court "in all matters and questions of law pertaining to any of [a] judge's duties."

control a copy of the grand jury transcript, alleged that the articles were derived from confidential news sources, and Gruner did not produce the transcript. The court denied the motion to quash. One of the contempt citations was based upon Gruner's failure to produce the transcript. Petitioner Bort, who did not appear at the hearings until April 21, testified that he did not have in his possession or under his control a copy of the grand jury transcript.

Prior to calling petitioners as witnesses at the hearings, the assistant county counsel, who conducted the hearings before the respondent court, called 13 witnesses who had lawful access to the grand jury transcript and who were subject to the court order. During the direct examination of all witnesses, petitioners and all other witnesses were excluded from the courtroom except when they themselves were testifying. Counsel for petitioners were permitted to remain in the courtroom but were not allowed to cross-examine witnesses except through a procedure whereby questions would be submitted to the assistant county counsel to be asked by him at his discretion.

Each of these 13 witnesses testified that he had no knowledge or information as to how any newsperson obtained a copy of any portion of the grand jury transcript, that he had no objection to newspersons disclosing to the court the source of the quotations from the grand jury transcript which had been published in The Fresno Bee, and that he had no objection to any newsperson releasing to the court any copy of the grand jury transcript in his or her possession. During the course of the examination of these persons, it developed that there were several persons who had either access to the grand jury transcript through one of the persons authorized to possess it or who had copied the transcript pursuant to a request by someone in lawful possession of the document, which persons were not called as witnesses. Among those so identified were the wife and daughter of the court reporter who worked for him in transcription work, the district attorney's secretary, the chief assistant attorney general of the state, a Xerox operator in the district attorney's office, secretaries in Robert Carter's office, counsel for Stefano, an investigator for the district attorney, and an associate attorney of Paul Mosesian, counsel for Aluisi.

Assistant Public Defender Hugh Goodwin testified that the public defender's copy of the grand jury transcript had been kept on Mr. Goodwin's desk for several weeks after he received it on November 12, 1974, and that the public defender's office is locked at the conclusion of

the day. He also testified that the transcript was on one particular corner of his desk for a long period of time and that it was there on a number of occasions when, to his knowledge, no one was in his office. He further indicated that, during the periods when he was there, petitioner Rosato and probably petitioner Patterson visited Goodwin in his office.

Thereupon, petitioners Rosato, Patterson and Gruner were called as witnesses, each of whom was permitted to consult frequently with his counsel, and each of whom was informed of the identity of the prior witnesses and of their statements and of the fact that each prior witness had testified that he had no objection to the disclosure by newsmen of the source of The Fresno Bee articles.

Each of the three petitioners, Rosato, Patterson and Gruner, testified that he did not obtain the "source material" for the articles from one of the defendants Stefano, Aluisi or Bains; from an attorney for one of the defendants; from an associate or employee of an attorney for one of the defendants; from an attorney; from anyone employed in the district attorney's office; from the district attorney himself; from anyone in the public defender's office; from the county clerk or anyone employed in that office; from the court reporter or anyone employed by him; from a public official; from a grand juror; from a witness before the grand jury; or from a court attaché or employee.

Patterson stated that no copy of the transcript was obtained by him or another Fresno Bee employee with the knowledge and consent of any of the persons mentioned above, nor was a copy of the transcript taken from the office of any public employee by an agent of the McClatchy Newspapers without knowledge or consent of persons having custody of the transcript. Gruner stated that an officer or employee of The Fresno Bee did not tell him that he or she had obtained a copy of the transcript from any of the persons or classes of persons subject to the order, and that no officer or employee of The Fresno Bee told him that he had any outside help in obtaining a copy of the transcript from one of the persons or classes of persons subject to the order without the knowledge or consent of such persons or classes of persons. Bort disavowed any knowledge as to how the transcript was obtained.

However, petitioner Rosato refused to answer whether he had obtained the transcript from the office of one of those same persons or classes of persons without their knowledge or consent or whether to his knowledge it had been taken from a public office by an agent or

employee of McClatchy Newspapers without the knowledge or consent of the persons having custody or control of it. He further refused to say whether or not he had seen the transcript on Assistant Public Defender Goodwin's desk or whether or not he had been in the offices of the public defender, district attorney or the county clerk when those offices were not open to the public; also, Rosato would not answer whether or not he had obtained the transcript in the courthouse.

Petitioner Patterson admitted that he had seen the grand jury transcript on top of the desk of Assistant Public Defender Goodwin and thought that he had seen it on the district attorney's desk on one occasion. He refused to answer the question as to whether Rosato had told him that he, that is, Rosato, had been in Mr. Goodwin's office at any time within three months preceding the hearing date when no one else was present.

Patterson admitted that he had a master key which he had obtained from a bailiff two or three years prior to the hearing. Upon request, the key was turned over to the court during the hearing. Testimony was adduced that the key was a master key to the Fresno County Courthouse, capable of unlocking various inside and outside doors thereof, including locks on the doors of the chambers of all of the judges of the superior court, doors leading into the corridors which separate the judges' chambers from the courtrooms, and the doors to the public defender's office. It also developed that Rosato had keys by which admittance to the public defender and county clerk's offices could be gained. It further appeared that on occasion two of the superior court judges had left the county clerk's copy of the transcript unattended overnight on their desks in locked chambers.

Pursuant to a stipulation that the answers would not constitute a waiver of the newsman's privilege as to other questions, Rosato, Patterson and Gruner testified that the keys in the possession of Rosato and Patterson were not used in acquiring the source material for the news articles of January 12, 13 and 14, 1975.

Petitioner Bort testified that the newspaper articles had been written about a month before they were actually published and they were published only after it was learned that the change of venue motion with respect to defendants Stefano and Aluisi was granted. He further stated that there was nothing in the stories with regard to the defendant Bains that had not already been published in earlier stories. Petitioner Gruner

testified substantially to the same effect, stating in part that in making the decision to publish the articles they took into consideration the fact that Stefano was a sitting member of the city council ". . . and we, having weighed the factor of the right to a fair trial, felt that in this instance the rights of the defendants would not be impaired in that regard since the venue change had already been indicated in the case of two of the individuals and that the information with regard to the third defendant was not of significant difference from material that had been published prior to the Grand Jury proceedings."

As a consequence of refusing to answer questions during the hearings, Rosato was cited 26 times for contempt, Patterson was cited 25 times, Gruner was cited 5 times, and Bort was cited 17 times..

### Scope and Validity of Protective Order and Seal Order

■ Persons accused of crime enjoy the fundamental constitutional right to a fair trial under the Sixth and Fourteenth Amendments to the United States Constitution. In *Sheppard* v. *Maxwell* (1966) 384 U.S. 333 [16 L.Ed.2d 600, 86 S.Ct. 1507], the Supreme Court breathed life and vigor into the fair trial concept as it is affected by pervasive pretrial and trial publicity. The court, in reversing a first degree murder conviction, mandated as an indispensable ingredient to a fair trial the right of a defendant to have his trial conducted free of pretrial and trial publicity affecting the fairness of the hearing, thus placing the right in a preferred position on the scale of constitutional values. The court, while recognizing the vital role of a free press in the effective and fair administration of justice, held that the publicity surrounding a trial may become so extensive, pervasive and prejudicial in nature that, unless neutralized by appropriate judicial procedures, a resultant conviction may not stand, and the trial court has the duty to so insulate the trial from publicity as to insure its fairness. In *Sheppard,* the court instructs: "The courts must take such steps by rule and regulation that will protect their processes from prejudicial outside interferences. Neither prosecutors, counsel for defense, the accused, witnesses, court staff nor enforcement officers coming under the jurisdiction of the court should be permitted to frustrate its function. Collaboration between counsel and the press as to information affecting the fairness of a criminal trial is not only subject to regulation, but is highly censurable and worthy of disciplinary measures." (384 U.S. at p. 363 [16 L.Ed.2d at pp. 620-621, 86 S.Ct. at p. 1522].)

The court there also stated that the trial court ". . . might well . . . [proscribe] extrajudicial statements by any lawyer, party, witness, or court official which [may divulge] prejudicial matters. . . ." (384 U.S. at p. 361 [16 L.Ed.2d at pp. 619-620, 86 S.Ct. at p. 1521].)

In the very recent California case of *Allegrezza* v. *Superior Court* (1975) 47 Cal.App.3d 948 [121 Cal.Rptr. 245] (hg. den. July 3, 1975), the court quoted from the Supreme Court case of *Estes* v. *Texas* (1965) 381 U.S. 532, 540 [14 L.Ed.2d 543, 548-549, 85 S.Ct. 1628, 1632], " '[t]he atmosphere essential to the preservation of a fair trial—the most fundamental of all freedoms—*must be maintained at all costs.*' " The *Allegrezza* court continued, "[i]t is the same right of a fair trial, to one accused of crime, that guarantees all other freedoms, including freedom of speech and of the press. For without the right to a fair trial those freedoms would lack any means of vindication in the face of governmental oppression." (47 Cal.App.3d at p. 952.)

With the impetus provided by *Estes* and *Sheppard,* various prestigious organizations and committees have conducted studies and proclaimed standards and recommendations for trial court action to assure a fair trial, among which is the issuance of a protective order operative against court officers similar to that in the case at bench.[9]

■ Grounded on both principle and precedent, there can be no doubt that the court had both the authority and the duty to issue the protective and seal orders in this case. The courts have inherent and implied power to control judicial proceedings in order to insure the orderly administration of justice. (*People* v. *Sidener* (1962) 58 Cal.2d 645, 656 [25 Cal.Rptr. 697, 375 P.2d 641]; *Millholen* v. *Riley* (1930) 211 Cal. 29, 33 [293 P. 69].) While certain of the implied powers have received legislative definition, the enactments neither created nor circumscribed the powers thus defined. Thus, Code of Civil Procedure section 128, subdivisions 3-5, represent a statutory confirmation of the court's power "[t]o provide for the orderly conduct of proceedings before it, or its officers," of power "[t]o compel obedience to its judgments, orders, and

---

[9]See: (1) American Bar Association Project on Minimum Standards for Criminal Justice, Standards Relating to Fair Trial and Free Press (Approved Draft 1968). See Reardon, *The Fair Trial-Free Press Standards* (1968) 54 A.B.A.J. 343. (2) Committee on the Operation of the Jury System, Report of the Committee on the "Free Press-Fair Trial" Issue of the Judicial Conference of the United States (1969) 45 F.R.D. 391; (1971) 51 F.R.D. 135. (3) Freedom of the Press and Fair Trial: Final Report with Recommendations of the Special Committee on Radio, Television and the Administration of Justice of the Association of the Bar of the City of New York. (Columbia University Press, 1967.)

process," and power "[t]o control . . . the conduct of its ministerial officers, and of all other persons in any manner connected with a judicial proceeding before it. . . ." This authority has been explicated and amplified by court decision. (See *Cooper* v. *Superior Court* (1961) 55 Cal.2d 291, 301 [10 Cal.Rptr. 842, 359 P.2d 274]; *People* v. *Merkouris* (1956) 46 Cal.2d 540, 556 [297 P.2d 999]; *People* v. *Smith* (1970) 13 Cal.App.3d 897, 907 [91 Cal.Rptr. 786].)

Specifically, with reference to protective orders, the trial court in *Frazier* v. *Superior Court* (1971) 5 Cal.3d 287, 295 [95 Cal.Rptr. 798, 486 P.2d 694], was commended by the Supreme Court of California for issuing an order re publicity. In *People* v. *Sirhan* (1972) 7 Cal.3d 710 [102 Cal.Rptr. 385, 497 P.2d 1121], a protective order substantially similar to that in the case at bench was issued, and both the Supreme Court of California and the United States Supreme Court denied review of its propriety. (*Younger* v. *Superior Court* (1968) 393 U.S. 1001 [21 L.Ed.2d 465, 89 S.Ct. 489]; Warren & Abell, *Free Press-Fair Trial: the "Gag Order," a California Aberration,* 45 So.Cal.L.Rev. 51, 61-62.) Moreover, like orders have received appellate approval in *Younger* v. *Smith (Busch* v. *Superior Court)* (1973) 30 Cal.App.3d 138, 156-159 [106 Cal.Rptr. 225], *Farr* v. *Superior Court* (1971) 22 Cal.App.3d 60 [99 Cal.Rptr. 342], and *Hamilton* v. *Municipal Court* (1969) 270 Cal.App.2d 797, 801 [76 Cal.Rptr. 168]. There has been a spate of such orders throughout the state. (See 45 So.Cal.L.Rev. 51, 62, *supra.*)

Thus, it is clear beyond cavil that the trial court had the authority and the affirmative duty to issue the protective order here and, pursuant to and independent of the authority contained in Penal Code section 938.1, to seal the transcript until the trials of the defendants were completed. (See *Craemer* v. *Superior Court* (1968) 265 Cal.App.2d 216, 223-225 [71 Cal.Rptr. 193].)

██ Petitioners contend that the orders are invalid because they were not given notice of nor opportunity to be heard at the hearings at which the protective and seal orders were issued. This argument misconceives the nature of the orders and the standing of the press. It is of crucial importance to keep clearly in mind that neither the press nor the petitioners were named in the protective or seal orders, that they were not subject to their terms, and that those orders did not purport to operate as a direct restraint on newspersons from publishing any information regarding the pending trial. Thus, the orders did not operate as a direct restraint on publication or free speech as was the

situation in *Sun Co. of San Bernardino* v. *Superior Court* (1973) 29 Cal.App.3d 815 [105 Cal.Rptr. 873] and *Younger* v. *Smith (Times Mirror Company* v. *Superior Court), supra,* 30 Cal.App.3d at p. 153, cited and relied upon by petitioners. Accordingly, the "clear and present danger" test, i.e., the requirement that the substantive evil or danger must be extremely high before publication of utterances can be restrained, is not applicable. (See *Bridges* v. *California* (1941) 314 U.S. 252, 263 [86 L.Ed. 192, 203, 62 S.Ct. 190, 159 A.L.R. 1346]; *Bantam Books, Inc.* v. *Sullivan* (1963) 372 U.S. 58, 70 [9 L.Ed.2d 584, 593, 83 S.Ct. 631, 639]; *People* v. *Superior Court (Freeman)* (1975) 14 Cal.3d 82 [120 Cal.Rptr. 697, 534 P.2d 393].)

Rather, the judge need only be satisfied that there is a reasonable likelihood of prejudicial news which would make difficult the impaneling of an impartial jury and tend to prevent a fair trial. (*Younger* v. *Smith (Busch* v. *Superior Court), supra,* 30 Cal.App.3d at pp. 159-164; *United States* v. *Tijerina* (10th Cir. 1969) 412 F.2d 661, 666.) This test is identical to the test which is used with regard to motions for change of venue in criminal cases (see *Maine* v. *Superior Court* (1968) 68 Cal.2d 375, 383 [66 Cal.Rptr. 724, 438 P.2d 372]; *Younger* v. *Smith (Busch* v. *Superior Court), supra,* at p. 160) and, as noted in *Busch,* the judge in making the order has little choice but to assume prophylactically that the case will be tried where the alleged crime was committed, which is usually the locality where the prejudicial publicity is likely to be the heaviest.

Moreover, the trial court does not have a duty to consult with the press or to allow them representation at hearings regarding whether or not to disclose evidence prior to trial. In *Allegrezza* v. *Superior Court, supra,* 47 Cal.App.3d 948, the trial court refused to permit an *in camera* hearing away from the press and public to determine the voluntariness of a confession pursuant to Evidence Code section 402, subdivision (b). The appellate court issued a peremptory writ requiring an in-chambers hearing and in the course of that opinion made the following observation, with which we agree: "The superior court was not obliged to strike a proper balance between the First Amendment right of freedom of the press, and the Fifth Amendment's guaranty of a fair trial. In the context of this case the rights of the press are no greater than the rights of the public generally. And the public generally has no right to pretrial disclosure of questionable evidence, a disclosure which might well deny to the accused the fair and impartial trial which is his due. [Citation.]" (47 Cal.App.3d at p. 951.) (See also *Craemer* v. *Superior Court, supra,* 265 Cal.App.2d at p. 219; *State* v. *Buchanan* (1968) 250 Ore. 244 [436 P.2d

729, 730-731] (cert. den. 392 U.S. 905 [20 L.Ed.2d 1363, 88 S.Ct. 2055]).) Accordingly, the press had no right to be notified or to be present when the orders were being considered.[10]

■ Petitioners argue that, because venue in the Stefano and Aluisi cases was changed outside Fresno County, the protective and seal orders lost their purpose and vitality and that after the transfer of these two cases there was no reason to conduct the hearings since the defendants were not prejudiced by the articles. However, the orders were as applicable to defendant Bains as they were to defendants' Stefano and Aluisi. Despite the existence of the court orders and the judicial determination represented by them, i.e., that revealing the transcript would tend to deprive defendant Bains of a fair trial also, the newspapers came to an opposite conclusion and published the articles nevertheless. We also note that, since it is admitted that the news articles were written approximately one month before they were published, the violation of the court orders obviously occurred well before the motions to change venue were made or granted.

Moreover, we have reviewed the contents of the articles in the light of the nature of the joint indictment against all of the defendants charging conspiracy and the rules with respect to the admissibility of evidence and find much of the information in the articles from the grand jury transcript to be not only highly prejudicial to defendant Bains but also subject to substantial question as to admissibility. We, therefore, do not accord any merit to petitioners' argument in this regard. (See *Farr* v. *Superior Court, supra,* 22 Cal.App.3d at pp. 67-68—the trial court retains the power to investigate the violation of the protective order and punish for contempt even where the principal action has terminated; *Morelli* v. *Superior Court* (1969) 1 Cal.3d 328, 332 [82 Cal.Rptr. 375, 461 P.2d 655].) At the time respondent court made the orders sealing the grand jury transcript and restricting dissemination of potentially prejudicial evidence prior to any trial and at the time of the publication of the three articles at issue, there existed a reasonable likelihood that publication of the grand jury transcript would endanger defendant Bains' right to a fair trial in Fresno County.

---

[10]It in fact appears that at the request of an attorney for the McClatchy Newspapers the court convened a hearing of defense counsel in the criminal cases on December 2 to determine if the protective order should be modified in certain particulars suggested by McClatchy's counsel. The modification was granted in one respect and denied in two others.

Petitioners have suggested that defendant Bains should also have moved for a change of venue. But a defendant has a right to have his case tried in the place of his residence, and no change of venue can be forced down his throat by publicity in the press. (See *Jackson* v. *Superior Court* (1970) 13 Cal.App.3d 440 [91 Cal.Rptr. 565, 46 A.L.R.3d 290].)

## AUTHORITY TO CONDUCT HEARINGS

■ Clearly, the trial court has the authority and duty to investigate possible violations of its protective and seal orders by those subject to their provisions in order to protect the integrity of the judicial process, to assure the proper administration of justice and to perfect the record pertaining to an issue likely to arise on appeal. To this end the court is empowered to require the attendance of witnesses, including those not subject to the orders, and to compel nonprivileged testimony germane to the objects of the hearing. (Code Civ. Proc., § 128, subds. 4, 5, 6, § 177, subds. 2, 3, § 187, § 1209, subds. 5, 8, 9; Evid. Code, § 775; *Millholen* v. *Riley, supra,* 211 Cal. at pp. 33-35; *Farr* v. *Superior Court, supra,* 22 Cal.App.3d 60, 69-70 (hg. den. Mar. 20, 1972; cert. den. 409 U.S. 1011 [34 L.Ed.2d 305, 93 S.Ct. 430]); *Whitlow* v. *Superior Court* (1948) 87 Cal.App.2d 175, 181-185 [196 P.2d 590]; see also *Morelli* v. *Superior Court, supra,* 1 Cal.3d at pp. 332-333; *Ligda* v. *Superior Court* (1970) 5 Cal.App.3d 811, 826 [85 Cal.Rptr. 744]; *Fairfield* v. *Superior Court* (1966) 246 Cal.App.2d 113, 120 [54 Cal.Rptr. 721].)

Petitioners' effort to distinguish *Whitlow* v. *Superior Court, supra,* upon which the *Farr* court relied, must fail. In the *Whitlow* case the court issued the subpoenas to the witnesses called. The decision explicitly states that the witnesses were not charged with a crime but were merely witnesses as to the court reporter's possible violation of his duty. (87 Cal.App.2d at p. 181.) And, the *Whitlow* court further explained that the *court itself* has a duty to inquire into the charges against its officers and attachés with respect to occurrences within the court and to take evidence to that effect. (87 Cal.App.2d at pp. 181-182.) Therefore, it is clear that the *Farr* court did not misapply the principles enunciated in *Whitlow* as they relate to a court's authority or procedures in investigating into misconduct of officers and attachés under its control.[11]

---

[11]While it is true that the district attorney participated in the proceeding, it was not a criminal proceeding and the court's duty and authority to investigate the court reporter's conduct was not dependent upon that participation.

Petitioners also argue that *Farr* should not be followed because it ignored *Ex parte Zeehandelaar* (1886) 71 Cal. 238 [12 P. 259], which case petitioners argue mandates a different result on the jurisdictional issue. However, they rely primarily upon dicta by a concurring justice which, of course, is not binding and does not constitute the holding of the court. (*People* v. *Amadio* (1971) 22 Cal.App.3d 7, 14 [98 Cal.Rptr. 909].) In the *Zeehandelaar* case, a divorce action, petitioner (a newsman) was sworn as a witness but refused to answer the one question put to him by respondent court, which was "I desire to know if [husband] or [an attorney] . . . has made to you any statements as to what transpired during the progress of the trial." (71 Cal. at p. 240.) The narrow holding of the majority of the court was that the refusal to answer the question was not contempt because the question was not pertinent to the issue of the divorce (71 Cal. at pp. 239-241), which at that time was the only issue before the court. The court had not convened, as here, a hearing to invesitgate the violation of a court order. Consequently, the *Farr* case properly ignored *Zeehandelaar.*

Petitioners also allege that, unlike *Farr* where the newsman told the court that persons subject to the order re publicity had violated the order, in the instant case respondent court had no such facts which would "trigger" the court's obligation to control its own officers by way of the hearings. We disagree. It is manifest that since the only copies of the grand jury transcript were originally in the hands of persons subject to the orders, any "leak" to the press would in the first instance appear to have been attributable to a court official. Thus, initially, pursuant to the authorities above cited, the court certainly had the authority to instigate efforts to determine whether or not its order had been violated by such persons.

■ At the initial stages, at least, proceedings to investigate violations of court orders instigated by the court itself are not prosecutions of crimes which may only be undertaken by the district attorney or the grand jury. (See *People* v. *Municipal Court* (1972) 27 Cal.App.3d 193 [103 Cal.Rptr. 645].) Therefore, to the extent that the *Farr* case authorizes such investigations by a court, that holding does not authorize a usurpation by the judiciary of functions exclusively within the province of the executive branch and is not unconstitutional. (Code Civ. Proc., § 128, subds. 4, 5, 6, § 177, subds. 2, 3, § 187, § 1209, subds. 5, 8, 9; Evid. Code, § 775; *Millholen* v. *Riley, supra,* 211 Cal. at pp. 33-35; *Farr* v. *Superior Court, supra,* 22 Cal.App.3d 60, 69-70; *Whitlow* v. *Superior Court, supra,* 87 Cal.App.2d 175, 181-185; see also *Morelli* v. *Superior*

*Court, supra,* 1 Cal.3d at pp. 332-333; *Ligda* v. *Superior Court, supra,* 5 Cal.App.3d at p. 826; *Fairfield* v. *Superior Court, supra,* 246 Cal.App.2d at p. 120.)

Whether or not the proceedings later turned into a criminal investigation or criminal prosecution will be considered at a later place in this decision.

### PRIVILEGE FOUNDED ON FEDERAL AND STATE CONSTITUTIONS

In the performance of their function as arbiter under the Constitution, the courts have quite properly shown extraordinary and sensitive solicitude for the preservation of a free and untrammeled press as an indispensable guardian of our freedom. (See, e.g., *Curtis Publishing Co.* v. *Butts* (1967) 388 U.S. 130, 145 [18 L.Ed.2d 1094, 1105, 87 S.Ct. 1975, 1986]; *Freedman* v. *Maryland* (1965) 380 U.S. 51, 56-57 [13 L.Ed.2d 649, 653-654, 85 S.Ct. 734, 737-738]; *N. A. A. C. P.* v. *Button* (1963) 371 U.S. 415, 439 [9 L.Ed.2d 405, 421-422, 83 S.Ct. 328, 341]; *Talley* v. *California* (1960) 362 U.S. 60, 64-65 [4 L.Ed.2d 559, 562-563, 80 S.Ct. 536, 538-539]; *Grosjean* v. *American Press Co.* (1936) 297 U.S. 233, 250 [80 L.Ed. 660, 668-669, 56 S.Ct. 444, 449]; *Near* v. *Minnesota* (1931) 283 U.S. 697, 722 [75 L.Ed. 1357, 1370-1371, 51 S.Ct. 625, 633].) It has been repeatedly acknowledged that the freedom exists to insure the unimpeded flow of information indispensable to the existence of a democratic society. (*Time, Inc.* v. *Hill* (1967) 385 U.S. 374, 389 [17 L.Ed.2d 456, 467-468, 87 S.Ct. 534, 543]; *Mills* v. *Alabama* (1966) 384 U.S. 214, 218-219 [16 L.Ed.2d 484, 487-488, 86 S.Ct. 1434, 1436-1437]; *New York Times Co.* v. *Sullivan* (1964) 376 U.S. 254, 269 [11 L.Ed.2d 686, 700, 84 S.Ct. 710, 720, 95 A.L.R.2d 1412].)

It is equally clear, however, that the absolutist view of the First Amendment guarantee held by some has never been accepted, although those freedoms are limited only by narrow, compelling exceptions (*Brandenburg* v. *Ohio* (1969) 395 U.S. 444, 447-448 [23 L.Ed.2d 430, 433-434, 89 S.Ct. 1827, 1829-1830]) and any interference therewith is closely and carefully scrutinized (*L.A. Teachers Union* v. *L.A. City Bd. of Ed.* (1969) 71 Cal.2d 551, 556 [78 Cal.Rptr. 723, 455 P.2d 827]). In weighing valid First Amendment interests against other substantial public and governmental interests, the conditional nature of the First Amendment right has been consistently recognized. Space does not

permit a cataloging of all instances in which some burden upon the press has been approved in the interests of other compelling public interests.[12]

So in *Branzburg* v. *Hayes* (1972) 408 U.S. 665 [33 L.Ed.2d 626, 92 S.Ct. 2646], the Supreme Court, while recognizing that requiring a newsman to disclose his source may inhibit the free flow of information by drying up that source, held that a newsman had to appear before a grand jury and answer all relevant questions during a criminal investigation, saying: "On the records now before us, we perceive no basis for holding that the public interest in law enforcement and in ensuring effective grand jury proceedings is insufficient to override the consequential, but uncertain, burden on news gathering that is said to result from insisting that reporters, like other citizens, respond to relevant questions put to them in the course of a valid grand jury investigation or criminal trial." (408 U.S. at pp. 690-691 [33 L.Ed.2d at pp. 644-645, 92 S.Ct. at p. 2661].) Thus the court held that while the press has a First Amendment right of uncertain dimensions to gather news and to not disclose sources, that right is outweighed by the state interest in the performance of a grand jury's duty to ferret out criminal activity and to prevent the arbitrary filing of complaints against innocent citizens. The court also verified that a newsperson would have the same duty to appear at trial pursuant to a subpoena and give what information he possesses.

■ In the light of the preeminent importance of the fair trial guarantee to criminal defendants (see *ante,* pp. 205-207) which is certainly entitled to equal, if not greater, protection than criminal investigations by grand juries, it seems to us that the right to require such testimony in an investigation growing out of the violation of an order which goes to the right of a criminal defendant to a fair trial is irrefutable. This question was definitively resolved in *Farr* v. *Superior Court, supra,* 22 Cal.App.3d at pages 72-73, wherein the court explicated:

"In the matter at bench there is an undeniable need for disclosure of source if the court is not to be thwarted in its effort to enforce its order against prejudicial publicity issued to comply with the mandate of the United States Supreme Court in *Sheppard* v. *Maxwell,* . . . 384 U.S. 333. That same mandate declares that the public interest in fair trial is so compelling as to both validate and require that in appropriate situations the public temporarily be denied access to prejudicial publicity emanat-

---

[12]See for a partial listing *Branzburg* v. *Hayes, infra,* 408 U.S. at pp. 682-684 [33 L.Ed.2d at pp. 639-641, 92 S.Ct. at pp. 2657-2658].

ing from court controllable sources. Since the highest court in the United States has ruled that prejudicial material from those sources may properly be kept from news media no public purpose is frustrated by compelling a newsman to reveal his source of a violation of an order such as that considered here. If disclosure of the source of a violation may inhibit future violations, the inhibition serves the public purpose declared by the high court and deprives the public of only that information which that court has declared must be kept from it temporarily if the constitutional right to a fair trial is to be preserved.

"Balancing, as we are required to do, the interest to be served by disclosure of source against its potential inhibition upon the free flow of information, we conclude that petitioner is not privileged by the First Amendment to refuse to answer the questions put to him in the trial court."

In *Farr* v. *Pitchess* (9th Cir. 1975) 522 F.2d 464, Farr sought federal habeas corpus relief from his sentence for contempt. In denying relief, the Ninth Circuit Court of Appeals expressly approved the trial court's conclusion that the conditional newsman's privilege not to disclose sources "must yield to the more important and compelling need for disclosure" (at p. 469) to protect the constitutional right of accused persons to a fair trial.

At the time the court ordered that the grand jury transcript be sealed, it impliedly found that the need to seal the transcript to protect the defendants' right to a fair trial outweighed the public right to know the contents of the transcript. At the commencement of the hearings at issue here, respondent court recognized the gravity of a possible violation of its protective and seal orders designed to protect the right to a fair trial, and, by necessity, determined that that right outweighed the right of any of the witnesses to not disclose sources by deciding to proceed with the questioning at the hearing; the "balancing" process occurred both at the time the transcript was ordered sealed and again at the commencement of the hearings.[13]

---

[13]As has been stated, when the court decided to go forward with the hearings, it recognized the seriousness of the violation of its orders designed to preserve and protect the right to a fair trial and the integrity of the court processes so necessary to guarantee that right in relation to the limited First Amendment right not to disclose. Having done that and properly decided under the law and the facts of this case that there was no First Amendment privilege, the balancing process was at an end. The dissent's suggestion that there is a constitutionally mandated multi-factor balancing process with respect to each question asked is not only impracticable, cumbersome and unworkable but is inconsis-

We have independently reviewed the record and have likewise come to the conclusion that the right to a fair trial outweighed the conditional First Amendment right to refuse to disclose sources. Accordingly, under the facts of this case, we hold that the petitioners herein were entitled to no federal constitutional privilege under the First Amendment.

With regard to the California constitutional provision contained in article I, section 2 (see fn. 4, *ante*), petitioners state in their brief that "[s]ince there is no substantive difference between the two documents with regard to press freedom, the same considerations should be instructive in the interpretation of the state [C]onstitution as are used to guide the courts in construing the United States Constitution." We agree with that position and hold by a parity of reasoning that there is no protection under the California constitutional provision.

Basing their argument upon some observations of Justice Powell in a short concurring opinion (a concurring opinion has no binding effect (*People* v. *Amadio, supra,* 22 Cal.App.3d 7, 14 [98 Cal.Rptr. 909])) and upon a test proposed by three of the dissenting justices in *Branzburg* and adopted in different forms by some lower courts (see *State* v. *St. Peter* (1974) 132 Vt. 266 [315 A.2d 254]; *Brown* v. *Commonwealth* (1974) 214 Va. 755 [204 S.E.2d 429] (cert. den. 419 U.S. 966 [42 L.Ed.2d 182, 95 S.Ct. 229]; *Democratic National Committee* v. *McCord* (D.D.C. 1973) 356 F.Supp. 1394; *Baker* v. *F & F Investment* (2d Cir. 1972) 470 F.2d 778;[14] cf. *Garland* v. *Torre* (2d Cir. 1958) 259 F.2d 545 (cert. den. 358 U.S. 910 [3 L.Ed.2d 231, 79 S.Ct. 237]), amici curiae argue that newsmen have a qualified privilege under the First Amendment to refuse to reveal their source of information if they can show (1) the testimony would be

tent with the conclusion arrived at before the hearings began, that under the circumstances no First Amendment privilege existed.

Moreover, whatever may happen to the principal criminal cases pending the investigative hearings, given the importance of the court order in assuring fair trials, the court has a continuing vital interest in ridding the fox from the chicken coop.

[14]These cases are in fact readily distinguishable from and reconcilable with the majority decision in *Branzburg* and with the result of the case at bench. Three of the cases (*State* v. *St. Peter, Democratic National Committee* v. *McCord, Baker* v. *F & F Investment)* involved a refusal of a journalist to disclose his source in civil discovery proceedings. As those cases expressly recognize in applying the *Branzburg* formulation, in a civil discovery proceeding there is not a sufficient compelling state or public interest to outweigh the conditional First Amendment right not to disclose sources, and for that primary reason discovery was denied. In the fourth case *(Brown* v. *Commonwealth)* the reporter refused to disclose sources of an article he had published about the crime while testifying at a criminal trial. The refusal was upheld upon the express ground that the statements attributable to the newsman were not material to any issue in the case, i.e., to the proof of the crime, to the defense or to the punishment.

irrelevant to the proceeding at hand, (2) the testimony would further no compelling state interest, and (3) alternate sources for obtaining the information have been exhausted. (See Goodale, *Branzburg v. Hayes and the Developing Qualified Privilege for Newsmen* (1975) 26 Hastings L.J. 709, 716-743.)[15] This was the position urged by the newsperson and press in *Branzburg* (see 408 U.S. at p. 680 [33 L.Ed.2d at pp. 638-639, 92 S.Ct. at p. 2656]), and, while the court recognized a conditional First Amendment right not to disclose sources and while factually the requirements of relevancy and compelling state interest were met in that case, as they are in the case at bench, the court in *Branzburg* imposed no requirement that alternate sources for obtaining the information be exhausted. (See 408 U.S. at pp. 702-706 [33 L.Ed.2d at pp. 651-654, 92 S.Ct. at pp. 2667-2669]; Witkin, Cal. Evidence (2d ed. 1974 Supp.) Witnesses, § 890, pp. 554-557.)[16] Essentially, our colleague in his dissent is arguing petitioner's position that this court should adopt a test which has already been rejected by the United States Supreme Court. We, of course, are bound by *Branzburg*. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937].) Any change will have to come from higher authority, to which these arguments are most certainly addressed.

## PRIVILEGE UNDER EVIDENCE CODE SECTION 1070

What has been said is prologue. The pivotal issue in this cause is the interpretation of the scope of and the limitations upon the protection afforded by Evidence Code section 1070. (See fn. 3, *ante.*)

Initially, we note that the meaning of the language "the source of any information . . ." has not been interpreted in this state.[17]

---

[15]Mr. Goodale is executive vice president of the New York Times and a member of the New York Bar. He was counsel for that newspaper in *United States* v. *Caldwell,* one of the trilogy of cases before the Supreme Court when *Branzburg* was decided.

[16]Moreover, counsel for petitioners at oral arguments conceded that the alternate source requirement had been met in this case. He stated: "Going back to our three-fold test, we would say, on the alternate source, that a reasonable stab was made in this case, a reasonable attempt was made by respondents [*sic*] to find an alternate source. So, our objection under the First Amendment argument is based on the second two grounds, relevance to guilt or innocence and compelling state need."

[17]Pointing to the fact that the section provides only that a newsperson is immune from contempt for failing to reveal the source of his information, rather than a privilege against all sanctions, respondent argues this evidences a legislative intent to narrowly construe the statute. We place no weight on this argument. Labeling the protection an immunity rather than a privilege is of no importance. At the very least, the statute creates a privilege against being held in contempt for refusing to answer questions concerning the source of information, which is precisely what the situation is in this case.

There is no available legislative history to show what the Legislature's purpose was in enacting the shield law in California, nor is there any explicit statement from that body on how broad it intended the privilege to be, so we must look to other aids. The first shield law was enacted by an amendment, in 1935, to former Code of Civil Procedure section 1881, a statute which listed certain privileges against giving testimony, after an introductory policy declaration stating that "There are particular relations in which it is the policy of the law to encourage confidence." The coverage of the section has been enlarged by several amendments since then. When the laws of evidence were codified in 1965, the newspersons' shield law became Evidence Code section 1070. The California Law Revision Commission, which was responsible for the initial drafting of the Evidence Code, noted that "Despite the absence of reliable evidence in the form of legislative history or judicial interpretation, the effect of the statutory privilege in California appears to be a carte blanche grant of an absolute and unqualified privilege to newsmen to refuse to disclose the source of any information procured for and used in the protected news media." (6 Cal.Law Revision Com. Rep. (1964), A California Privilege Not Covered by the Uniform Rules—Newsmen's Privilege, pp. 481, 484.) The California Law Revision Commission favored placing limitations on the privilege, but the Legislature rejected the proposals. "Reports of commissions which have proposed statutes that are subsequently adopted are entitled to substantial weight in construing the statutes. [Citations.]" (*Van Arsdale* v. *Hollinger* (1968) 58 Cal.2d 245, 249 [66 Cal.Rptr. 20, 437 P.2d 508].)

A cardinal rule of statutory construction is summarized in 45 Cal.Jur.2d, Statutes, section 116: "Statutes must be given a reasonable and common sense construction in accordance with the apparent purpose and intention of the lawmakers—one that is practical rather than technical, and that will lead to a wise policy rather than to mischief or absurdity. Thus, where a statute is susceptible to two constructions, the one that leads to the more reasonable result will be followed. A literal construction that will lead to absurd results should not be given if it can be avoided."

■ Having in mind this rule as it relates to the unqualified language used in Evidence Code section 1070, together with the observations of the California Law Revision Commission, we believe the Legislature in enacting Evidence Code section 1070 recognized the importance of maintaining a free flow of information and intended that the statute be given a broad rather than a narrow construction. Accordingly, absent any

constitutional or other limitation on the exercise of the privilege (see discussion, *post*), we believe it extends not only to the identity of the source but to the disclosure of any information, in whatever form, which may tend to reveal the source of the information, and, as in the case of the privilege against self-incrimination, the burden is upon the person claiming the privilege to show that the testimony may tend to lead to that source. Though the burden is on the person claiming the privilege, it is not a heavy one. (*United States* v. *Reynolds* (1953) 345 U.S. 1 [97 L.Ed. 727, 73 S.Ct. 528, 533, 32 A.L.R.2d 382]; Evid. Code, § 404; *Cohen* v. *Superior Court* (1959) 173 Cal.App.2d 61, 68 [343 P.2d 286]; Witkin, Cal. Evidence (2d ed. 1966) Witnesses, § 933, pp. 869-870.)

In arriving at this conclusion, we have in mind the similar criteria utilized in analyzing the scope of the privilege against self-incrimination (Evid. Code, §§ 940, 404),[18] which we believe to be an appropriate analogy, to be used as a guide only, in this case. (See Jefferson, Cal. Evidence Benchbook (1972) Privilege Against Self-Incrimination, §§ 44.4, 44.5, pp. 765-769.) Likewise, in determining the applicability of the newsperson's privilege, the court must, as it does with the privilege against self-incrimination, consider not only the offered evidence but the matters disclosed in argument, the implication of the question, the setting in which it is asked, and all other relevant factors. (*United States* v. *Reynolds* (1953) 345 U.S. 1, 8-9 [97 L.Ed. 727, 733-734, 73 S.Ct. 528, 532-533]; *Cohen* v. *Superior Court, supra,* 173 Cal.App.2d 61, 70.)

■ Having defined the scope of the newsperson's privilege under Evidence Code section 1070, we next consider limitations on the exercise of that privilege.

While petitioners have not expressly contended that section 1070 shields newspersons from testifying about criminal activity in which they have participated or which they have observed, it is noted that this approach has been denied by the Supreme Court of the United States and by the Legislature in analogous statutory privileged relationships.

As the Supreme Court pointedly observed in *Branzburg* v. *Hayes, supra,* 408 U.S. at pages 691-692 [33 L.Ed.2d at pp. 645-646, 92 S.Ct. at p. 2662]: "It would be frivolous to assert—and no one does in these cases—that the First Amendment, in the interest of securing news or

---

[18]Evidence Code section 940 provides: "To the extent that such privilege exists under the Constitution of the United States or the State of California, a person has a privilege to refuse to disclose any matter that may tend to incriminate him."

otherwise, confers a license on either the reporter or his news sources to violate valid criminal laws. Although stealing documents or private wiretapping could provide newsworthy information, neither reporter nor source is immune from conviction for such conduct, whatever the impact on the flow of news. Neither is immune, on First Amendment grounds, from testifying against the other, before the grand jury or at a criminal trial. The Amendment does not reach so far as to override the interest of the public in ensuring that neither reporter nor source is invading the rights of other citizens through reprehensible conduct forbidden to all other persons. . . .

"Thus, we cannot seriously entertain the notion that the First Amendment protects a newsman's agreement to conceal the criminal conduct of his source, or evidence thereof, on the theory that it is better to write about crime than to do something about it. Insofar as any reporter in these cases undertook not to reveal or testify about the crime he witnessed, his claim of privilege under the First Amendment presents no substantial question. The crimes of news sources are no less reprehensible and threatening to the public interest when witnessed by a reporter than when they are not." (Fn. omitted.) (See Witkin, Cal. Evidence (2d ed. 1974 Supp.) Witnesses, § 890, pp. 554-557.)

The limitation also has been applied to legislative privilege (*Gravel* v. *United States* (1972) 408 U.S. 606, 628 [33 L.Ed.2d 583, 604, 92 S.Ct. 2614, 2628]) and to the executive privilege of the President of the United States (*United States* v. *Nixon* (1974) 418 U.S. 683 [41 L.Ed.2d 1039, 94 S.Ct. 3090]).

Similar principles apply to the attorney-client privilege (Evid. Code, § 956; *Abbott* v. *Superior Court* (1947) 78 Cal.App.2d 19, 21 [177 P.2d 317]; *Agnew* v. *Superior Court* (1958) 156 Cal.App.2d 838, 840 [320 P.2d 158]), the marital communications privilege (Evid. Code, § 981; *People* v. *Pierce* (1964) 61 Cal.2d 879, 881 [40 Cal.Rptr. 845, 395 P.2d 893]), the physician-patient privilege (Evid. Code, §§ 997, 999) and the psychotherapist-patient privilege (Evid. Code, § 1018).

A second limitation upon the privilege is that enunciated as being constitutionally mandated in *Farr* and springs from the inherent power of the judiciary as a separate and coequal branch of our tripartite governmental structure to control its own proceedings and officers.[19]

---

[19]In *Wood* v. *Georgia* (1962) 370 U.S. 375, 383 [8 L.Ed.2d 569, 576, 82 S.Ct. 1364, 1369] the court said: "We start with the premise that the right of courts to conduct their

In *Farr,* a protective order which was substantially similar to the protective order in the case at bench was issued early in the proceedings of the Charles Manson murder case. Subsequent to the issuance of this order and while the trial was in progress, reporter Farr obtained copies of a written statement of one of the defense witnesses containing information which was highly inflammatory in nature and potentially damaging to the defendants in the trial. Farr admitted that the copies of the statement were supplied to him by two of six attorneys who were subject to the protective order and by an undisclosed third person who was also subject to the order. Farr told his potential sources of the statement that he would keep confidential the identity of the source. The written statements were subsequently published in the press. Much of the statement was later barred from evidence at trial.

After the trial, the court convened a hearing to determine whether there had been a violation of the order re publicity, which violation had jeopardized a fair trial for the defendants in the Manson case. Farr was called as a witness in the hearing and was asked to disclose the identity of the persons from whom he had obtained the statement. Farr refused, claiming immunity under Evidence Code section 1070. He similarly refused to answer questions seeking to ascertain the places where he had obtained the copies of the statement, the attorneys of record approached by him to obtain the statement and to whom he had given a promise of confidentiality of source, a question asking whether a source of the statement was an associate or an attorney of record, and a question asking whether a copy of the statement had been obtained from the office of the district attorney. He was cited for contempt and ordered jailed until he answered the questions. Additionally, the six attorneys testified that they did not give the statement to Farr.

In holding that Farr had no privilege to refuse to answer the questions posited, the court explained:

"The power of contempt possessed by the courts is inherent in their constitutional status. While the Legislature can impose reasonable restrictions upon the exercise of that power or the procedures by which it may be exercised (*In re McKinney,* 70 Cal.2d 8 [73 Cal.Rptr. 580, 447 P.2d 972]), it '[cannot] declare that certain acts shall not constitute a . . . contempt.' (*In re San Francisco Chronicle,* 1 Cal.2d 630, 635 [36 P.2d

business in an untrammeled way lies at the foundation of our system of government and that courts necessarily must possess the means of punishing for contempt when conduct tends directly to prevent the discharge of their functions."

369].) Thus, former subdivision 13 of Code of Civil Procedure section 1209 which provided: '[N]o speech or publication reflecting upon or concerning any court or any officer thereof shall be treated or punished as a contempt of court unless made in the immediate presence of such court while in session and in such a manner as to actually interfere with its proceedings' was held unconstitutional by our Supreme Court as an invalid legislative effort to abridge the inherent power of the court. *(In re San Francisco Chronicle, supra.)*

"If Evidence Code section 1070 were to be applied to the matter at bench to immunize petitioner from liability, that application would violate the principle of separation of powers established by our Supreme Court. That application would severely impair the trial court's discharge of a constitutionally compelled duty to control its own officers. The trial court was enjoined by controlling precedent of the United States Supreme Court to take reasonable action to protect the defendants in the Manson case from the effects of prejudicial publicity. *(Sheppard* v. *Maxwell,* 384 U.S. 333 [16 L.Ed.2d, 600, 86 S.Ct. 1507].) It performed its duty by issuing the order re publicity. By petitioner's own statement that order was violated by two attorneys of record, of a list of six counsel in the case. Those attorneys were officers of respondent court. By petitioner's own statement the violations occurred because of his solicitation. Respondent court was both bound and empowered to explore the violations of its order by its own officers. [Citations.]

"Without the ability to compel petitioner to reveal which of the six attorney officers of the court leaked the Graham statement to him, the court is without power to discipline the two attorneys who did so, both for their violations of the court order and for their misstatement to the court that they were not the source of the leak. Equally significant is the proposition that petitioner tarred six counsel with the same brush. Unless the court compels him to reveal which two of the six violated their professional obligation, four reputations of officers of the court will remain unjustly impaired.

"We thus conclude that Evidence Code section 1070 cannot be applied to shield petitioner from contempt for failure to reveal the names of the two attorneys of record in the Manson trial who furnished him with copies of the Graham statement. A closer question exists with respect to petitioner's refusal to divulge the identity of the third person, possibly not an attorney of record but subject to the order re publicity who gave him a copy of the statement. Here the court's power to compel an answer

in the face of Evidence Code section 1070 must rest primarily upon the necessity of disclosure as a means of enforcement of its obligation to prevent prejudicial publicity emanating from its attachés or the office of the prosecuting attorney. We conclude here, also, that section 1070 if applied to immunize petitioner from contempt would unconstitutionally interfere with the power and duty of the court. The record is clear that the only persons other than attorneys of record who had access to the Graham statement and who were subject to the order re publicity were attachés of the court and members of the district attorney's office. The mandate of the United States Supreme Court that the trial court control prejudicial publicity emanating from such sources (*Sheppard* v. *Maxwell, supra,* 384 U.S. 333) can be discharged only if that court can compel disclosure of the origins of such publicity." (*Farr* v. *Superior Court, supra,* 22 Cal.App.3d at pp. 69-71; fns. omitted.)[20]

We agree with these observations of the *Farr* court.

Thus the key to the court's power to compel an answer in the case at bench in the face of Evidence Code section 1070 is the necessity of exploring the violation of its orders by those subject thereto as a means of enforcing the court's constitutional obligation to prevent prejudicial publicity from emanating from its officers.

It is true that *Farr* is distinguishable on its facts, but we have concluded that it is not distinguishable on principle. As pointed out by petitioners, the primary distinguishing fact in *Farr* is that, in that case, through the testimony of Farr himself the court was aware that the persons who gave the information to Farr were court officers. The court was careful to point out that the holding is restricted to the facts, stating: "We express no opinion on the quantum of proof required to establish that inquiry into a newsman's source is necessary to permit the court to carry out its duty to control its own officers and to restrict persons subject to its control from disseminating prejudicial pretrial publicity. Here petitioner has admitted the necessary facts. Neither do we express an opinion on the validity of Evidence Code section 1070 where a possible source of the newsman's story contrary to a *Sheppard* [*Sheppard* v. *Maxwell,* 384 U.S. 333 (16 L.Ed.2d 600, 86 S.Ct. 1507)] order is other than an attorney of record, a court attaché, or the prosecutor's office" (22 Cal.App.3d at p. 71, fn. 5). In a sequel opinion written by the same judge (*In re Farr* (1974) 36 Cal.App.3d 577, 582 [111 Cal.Rptr. 649]), the court

---

[20]Contrary to the suggestion of the dissent, the *Farr* case does not turn upon nor is there any mention of a "waiver" in that case.

said: "In listing the sources as including two of six attorneys of record named by him, petitioner for the first time informed the court of facts which triggered its obligation to control its own officers." Seizing on this language, the petitioners in the instant case say that *Farr* is inapplicable because there was nothing to "trigger" the court's obligation to initiate an investigation of its officers since both the persons subject to the order and the petitioners, respectively, denied giving or receiving the transcript.

We cannot agree with this crabbed view of the court's obligation and duty to assure a fair trial to the defendants by preventing release of potentially prejudicial publicity and to control its own officers and employees.

First, the court procedures were investigative and not adjudicative and were directed toward preservation of the precious constitutional right to a fair trial. Such an investigation should not be thwarted by narrowly construing the scope of the inquiry, and any doctrinal tension between the First Amendment and the Sixth Amendment resulting in an impasse must be resolved in favor of the relatively unrestricted constitutional right to a fair trial rather than in favor of the relatively limited invasion on freedom of the press caused by the necessity of revealing a relatively restricted category of news sources. (*Farr* v. *Superior Court, supra,* 22 Cal.App.3d at pp. 72-73.) Because the court's task is directed toward the protection of the constitutional right to a fair trial, its investigative power should necessarily be broad. (*Branzburg* v. *Hayes, supra,* 408 U.S. at p. 688 [33 L.Ed.2d at pp. 643-644, 92 S.Ct. at p. 2660].)

Second, the factual difference between this case and *Farr* is one of degree, not principle. There, the admission by Farr that he got the protected statement from a person subject to the order, though those persons had denied it, "triggered" the court's obligation to investigate its own officers. In the instant case, the court had a precise record of the persons to whom copies of the transcript were originally delivered and entrusted, each being subject to the protective and seal orders; each of these persons denied at the hearing that he delivered the transcript or information relative to its contents to newspersons, and, though the petitioners denied receiving a copy of the transcript or information as to its contents from the only persons to whom a copy was originally delivered, it is undisputed that the statements which appeared in The Fresno Bee were directly quoted from the transcript. Faced with that unresolved mystery, petitioners would argue, the court thereupon

became powerless to conduct further investigation merely because the court's officers and the petitioners denied implication. We disagree. The court is not required to believe witnesses. More particularly, its investigation should not be truncated by mere denials of implication. As in other investigations and hearings, the court is authorized within the permissible scope of relevancy and absent applicable privileges to subject witnesses to penetrating interrogation in search of the truth. It would appear self-evident that if justification for instituting the investigation is grounded upon the need to assure a fair trial and to discipline those who have violated a court's orders, those needs are no less compelling because certain of the witnesses have denied a violation took place.[21]

While we cannot accept the view of petitioners that a court is totally impotent to proceed further once there has been a denial of implication by the court officers and by the press personnel, neither can we accept the view of respondent court that the protection afforded to the press by the privilege is totally emasculated by the necessity of the court to determine which of its officers violated the protective and seal orders. ■ Consequently, we view the second limitation on the otherwise absolute protection afforded by the shield law (discussed *ante*) as being applicable only when the questions asked may tend to identify who, if anyone, *among those subject to a court's order,* may have violated it. The shield law still remains as a protection against the revelation of all sources other than court officers, and a reporter cannot be required to divulge information which would tend to reveal any source other than those court officers subject to the orders issued by the court.

■ The key to the application of the above enunciated test is a determination on a question-by-question basis as to whether or not the answer to a question may tend to endanger the revelation of a protected source. To this end, within the rather narrow constrictions described above and even in the face of denials that court officers were involved, questions may continue to be asked if the answers may reveal that the source of the information was a court officer. Evidence Code section 1070 would not protect a refusal to answer this type of question. However, should a question be overbroad, i.e., it might tend to reveal that either a court official *or* a protected source was involved in the newsperson's

---

[21]As noted in *Branzburg* v. *Hayes, supra,* 408 U.S. at pp. 707-708 [33 L.Ed.2d at pp. 654-655, 92 S.Ct. at p. 2670], such investigations are, of course, subject to the requirements that they be instituted and conducted in good faith and that "[o]fficial harassment of the press undertaken not for purposes of law enforcement but to disrupt a reporter's relationship with his news sources would have no justification."

obtaining of the information, the privilege under Evidence Code section 1070 would apply. Furthermore, a court is not entitled to ask questions directed toward discovering where the information did *not* come from (other than as they pertain to court officials) in order to narrow the field of inquiry vis-a-vis the protected sources. The court is only entitled to ask questions directed toward affirmatively determining if the information did come from court officers or attachés.

It appears to us that this solution accomplishes an equitable resolution of this difficult question by properly recognizing, protecting and accommodating the competing interests of newspersons in protecting their sources and of the judiciary in assuring criminal defendants' rights to a fair trial.

Because the abstract articulation of the test is somewhat abstruse, we believe its application to each of the questions asked petitioners will furnish clarification. Accordingly, we attach as Appendix "A" (see *post*, p. 242), a list of the 26 questions asked of Rosato, 25 questions asked of Patterson, 5 asked of Gruner and 17 asked of Bort, answers to which were refused, together with an indication of whether the questions should have been answered, and, in some instances, an explanatory comment.[22]

In arriving at these conclusions, we note that no issue has been raised by petitioners regarding the relevancy of the questions asked. It appears to us that no valid objection could be raised on this ground. In addition to being relevant on the issue of who, if anyone, among the court officers affirmatively delivered the transcript to newspersons, the questions asked were germane to the issue of any possible carelessness, indifference, neglect, connivance or collusion on the part of such officers in permitting the transcript to fall into the hands of petitioners; certainly the latter type of conduct would be subject to disciplinary action by the court.[23] Moreover, had a copy of the transcript, which was the source of the articles, been produced by petitioner Gruner pursuant to the subpoena duces tecum it could well have contained telltale variations or marks

---

[22]We realize that follow-up questions to the specific questions we have ruled upon herein will usually be asked, some of which could endanger a protected source. The test which has been enunciated should be carefully applied to each of such inquiries on a question-by-question basis to determine whether an answer is required. If each question is considered on its own merits and if the test is properly applied, we are satisfied no protected source will be in jeopardy.

[23]In this connection it is to be noted that while the protective order appears to be restricted to the prohibition of affirmative conduct, the seal order contains no such limitation.

revealing from which court officer the source material originated.[24] Of some significance is the fact that publication of the articles cast a pall of suspicion over the officers of the court that one or more of them had violated their professional and ethical duties as attorneys and court officers; the ones not responsible certainly have a legitimate interest in being exonerated by discovery and revelation of the truth.

## DENIAL OF DUE PROCESS

As has been stated, the hearings out of which these proceedings arose were conducted over a period of time on January 24 and 27, on February 6 and on April 21 and 23, 1975. Petitioner Bort was first subpoenaed for appearance and testified at the April 21, 1975, hearing.

Basing their contentions on the allegation that commencing at the February 6, 1975, hearing, the inquiry below turned into an inquisition to inculpate petitioners in criminal conduct, petitioners contend that (1) the court lost jurisdiction to continue the hearing because the judicial branch has no authority to investigate crime and (2) because of the prosecution-like nature of the proceedings, petitioners were entitled to the full panoply of due process rights, including the right to notice of the charges against them and the right to call, to confront and to cross-examine witnesses.

It is, of course, true that it is clearly not the function of the court to investigate criminal violations. The power to enforce the state's laws is vested in the Attorney General (Cal. Const., art. V, § 13), and the responsibility for investigating and prosecuting criminal activity is vested in the district attorney or the grand jury. (Gov. Code, § 26500; Pen. Code, § 917.) No one can institute criminal proceedings without the concurrence, approval or authorization of the district attorney. (*People* v. *Municipal Court (Bishop)* (1972) 27 Cal.App.3d 193, 204-206 [103 Cal.Rptr. 645].)

However, the fact, if it be a fact in the instant case, that the inquiry by the court incidentally reveals a suspicion of criminal activity which may result in criminal prosecutions of persons or witnesses does not inhibit the proceedings instituted for the purpose of determining who, if anyone, has violated the court's protective and seal orders. (See *Whitlow* v. *Superior Court* (1948) 87 Cal.App.2d 175, 182-184 [196 P.2d 590].)

---

[24]If the copy of the transcript contained telltale marks that would tend to reveal a protected source, a refusal to answer on that ground would be properly sustained.

A review of the facts and circumstances of the proceedings below convinces us that, while there was some suggestion that some of the petitioners may have been involved in criminal activity in procuring the transcript, the proceedings did not substantially deviate from the primary objective of ascertaining the identity of those persons who may have violated the court's orders. The suggestion of criminal activity was incidental to the accomplishment of the principal objective, and, manifestly, an investigation of potential crimes was not the purpose of the investigation; it is an extravagant exaggeration to assert that the proceedings became a criminal investigation or criminal prosecution within either the legal or commonly accepted definition of those terms.

 Amici curiae also contend that the investigative hearings should have been conducted before a judge other than the one who entered the protective order. They allege that on or about February 6 Judge Peckinpah of the respondent court became so personally embroiled in what he took as an attack upon his authority by the press that he could not impartially judge the contempts. We disagree.

It is to be noted that all of the contempt citations involved in these proceedings, except those of petitioner Bort who first appeared as a witness on April 21, resulted from refusing to answer questions at hearings conducted prior to February 6; petitioners in their brief impliedly concede that there was no prosecution-like hearing prior to the latter date. The matters which occurred on February 6 did not relate to petitioner Bort.

It is true that the court upon learning that petitioner Patterson had a master key to the courthouse stated at the February 6 hearing that the "inquiry must be broadened" and went on to warn the petitioners that "at the continued hearing on this matter, any refusal to answer questions . . . had better be based on your constitutional rights against self-incrimination . . . ," rather than on the First Amendment privilege or on Evidence Code section 1070. Also subsequent to the hearing on February 6, the judge of the respondent court issued a press release in which he characterized the press reaction to the case as either based on ignorance or constituting "a biased presentation." In the subsequent hearing on April 21 the judge made further reference to what he perceived to be media "pressure" addressed to him "individually."

While the judge's disseminating formal comments to the press concerning a matter pending before him was inappropriate, the judge's

impropriety in this respect does not invalidate the proceedings. Neither do we detect from those statements and conduct any prejudice in fact. Notwithstanding any impropriety, it appears in the actual conduct of the proceedings the judge was judicious and evenhanded. Moreover, petitioners either had to answer the questions or they did not, and, as we have indicated, the majority of these questions were not accusatory, were perfectly proper and should have been answered. It does not appear that any questions which may carry an accusatory overtone were asked during or after the February 6 hearing. The questions asked of petitioner Bort after February 6 were of the same tenor as those asked of the others prior to that date.

If the judge harbored a personal grievance against the petitioners, we are unable to perceive how or in what manner it affected the merits of the inquiry or the sentences imposed or that it had any impact upon the fairness of the proceedings.

■ It is, of course, true that a criminal defendant when accused of crime is entitled to the due process rights mentioned, *ante.* However, at the investigatory stage (even by a grand jury which, of course, this is not) a potential defendant is not entitled to produce witnesses on his own behalf or to confront and cross-examine other witnesses, though under some circumstances such a person may be entitled to be warned of his rights against self-incrimination and to have counsel. (*United States* v. *Mandujano* (5th Cir. 1974) 496 F.2d 1050.)

Thus, as witnesses only, petitioners were not entitled to call and cross-examine witnesses or to object to questions.

However, notwithstanding the lack of any requirement that it do so (see *Whitlow* v. *Superior Court, supra,* 87 Cal.App.2d at p. 184), respondent court accorded petitioners herein the right to and they in fact had counsel throughout the proceedings, and their counsel was given the opportunity to submit to the court questions to be asked of witnesses, a privilege rarely exercised by petitioners' counsel and always observed except as to questions which had already been asked and answered.[25] While petitioners, as potential witnesses, were excluded from the courtroom during earlier hearings, pursuant to the authority of Evidence

---

[25]As to the questions which petitioners' counsel indicated the county counsel refused to ask, the questions were, pursuant to agreement with counsel, later asked of the petitioner Gruner instead of the petitioner Bort.

Code section 777, they were not excluded at any time during or after the February 6 hearing.

The record further reveals that none of the petitioners except Bort requested the opportunity to call witnesses in mitigation of punishment. As to Bort, contrary to petitioners' contention, he was given the opportunity to call witnesses in mitigation of punishment before sentence was passed.

Next, no substantial question can be raised that petitioners did not have notice of the proceedings or know what they were all about prior to any of the hearings.[26]

Additionally, petitioners were given notice of the charges and an opportunity to be heard prior to the imposition of the sentences for contempt and they make no claim that the procedural rights set forth in *In re Karagozian* (1975) 44 Cal.App.3d 516, 522-524 [118 Cal.Rptr. 793], were not complied with. All petitioners were given the opportunity to purge the contempts before sentences were passed.

Finally, the coercive rather than punitive sentence imposed by respondent court and authorized by Code of Civil Procedure section 1219[27] was less severe than that which the court could have imposed under Code of Civil Procedure section 1218.[28] Under this sentence the contemnor in a sense carries the key to his liberty in his pocket. It has

[26]In addition to widespread local publicity concerning the hearings, the declaration attached to the subpoena duces tecum served on Rosato, Patterson and Gruner prior to the hearing contained the following statement: "On November 21 and 22, 1974, the above court issued orders sealing the aforesaid transcript of the Grand Jury proceedings and prohibiting persons who were in possession thereof and certain others from divulging information regarding said Grand Jury proceedings. Subsequently, on January 12, 13 and 14, 1975, news articles appeared in The Fresno Bee purporting to quote from said sealed Grand Jury transcript. The court has set a hearing at the date and time first-above mentioned to determine whether or not its said order or orders have been violated. The copy of said transcript in the possession or under the control of said witness would probably establish that the court order or orders have in fact been violated and may establish who, if anyone, has violated such order or orders."

[27]Code of Civil Procedure section 1219 provides: "When the contempt consists in the omission to perform an act which is yet in the power of the person to perform, he may be imprisoned until he [has] performed it, and in that case the act must be specified in the warrant of commitment."

[28]Code of Civil Procedure section 1218 provides in pertinent part: "Upon the answer and evidence taken, the court or judge must determine whether the person proceeded against is guilty of the contempt charged, and if it be adjudged that he is guilty of the contempt, a fine may be imposed on him not exceeding five hundred dollars ($500), or he may be imprisoned not exceeding five days, or both. . . ."

long been recognized as not being punishment but as an appropriate remedy to obtain necessary compliance from a recalcitrant and contemptuous witness. As such, the power would exist independently of statute. (*United States* v. *Mine Workers* (1947) 330 U.S. 258, 297-298, 330-332 [91 L.Ed. 884, 914-915, 931-933, 67 S.Ct. 677, 697-698, 713-715]; *In re Salkin* (1935) 5 Cal.App.2d 436 [42 P.2d 1041].)

## STANDING, RES JUDICATA, AND LAW OF THE CASE

We reject respondent's threshold contentions that petitioners had no standing to challenge the validity of the protective and seal orders and that our ruling upon denial of a former petition by Rosato, Patterson and Gruner (William K. Patterson et al., petitioners, v. Superior Court of Fresno County et al., 5 Civil No. 2551) for a writ of prohibition to stop the inquiry below constitutes a bar to reconsideration of the issue raised in that petition at this time.

■ Petitioners have standing under principles analogous to those expressed in *Craemer* v. *Superior Court, supra,* 265 Cal.App.2d 216, 218, fn. 1 [71 Cal.Rptr. 193]. Furthermore, the hearings had their genesis in the protective and seal orders because the court derived its initial authority to conduct the hearings from alleged violations of those orders; therefore, petitioners' "injury" arose indirectly from those charged violations. It is patent that the petitioners have standing to challenge the jurisdiction of the court to hold hearings from which the contempt citations issued. (*State Bar of California* v. *Superior Court* (1929) 207 Cal. 323, 339-340 [278 P. 432].)

■ With regard to the issue of res judicata and law of the case, it is to be noted that our former denial of a petition for a writ of prohibition to stop the inquiry below was a summary denial without issuance of an order to show cause and without oral argument. While it is true that the court accompanied the summary denial with an explanatory comment, we do not regard that comment as a formal opinion (Cal. Const., art. VI, § 14) precluding this court from considering the issue anew upon this hearing at which the parties have had an opportunity to brief and argue the case in full. (*People* v. *Shuey* (1975) 13 Cal.3d 835, 844-846 [120 Cal.Rptr. 83, 533 P.2d 211]; *People* v. *Medina* (1972) 6 Cal.3d 484, 490-492 [99 Cal.Rptr. 630, 492 P.2d 686].) One important incident to the right to appeal from a superior court's judgment is the right to present oral arguments before the appellate court. (Pen. Code, § 1254; Cal. Rules of Court, rules 22, 30; *People* v. *Medina, supra,* 6 Cal.3d at pp. 489-490.)

This right was denied petitioners in their prior petition for a writ of prohibition. We conclude that the absence of that right and the nature of the memorandum rendered, together with the fact we did not have the full record before us, precludes the application of principles which would prevent this court from full consideration of the issues at this time.

## DISPOSITION

The judgments of contempt are annulled as to the questions appearing on Appendix "A" as numbers 8, 9, 11, 12, 13, 14, 15 and 23 asked of Rosato, numbers 3, 8, 11, 14, 20, 21, 22 and 24 asked of Patterson, and as numbers 9 and 10 asked of Bort. The judgments are affirmed as to the balance of the questions asked of each petitioner; in view of the understandable uncertainty as to the scope of the privilege, and believing the petitioners refused to answer the latter questions in good faith, fairness requires that the cause be and it hereby is remanded to the superior court for the purpose of affording each of the petitioners an opportunity to purge his contempts before his sentence is executed and for such further proceedings as may be appropriate under the circumstances.

Each party shall bear his or its own costs.

Gargano, J., concurred.

**FRANSON, J.,** Concurring and Dissenting.—I concur in the majority's holding that the respondent court had the right to make inquiry of petitioners as to whether a defendant or court officer had violated its order but that Evidence Code section 1070 gives to petitioners a privilege not to disclose the confidential source of their news stories except as the source was one of those persons. I also concur in the majority's recognition that the privilege should be given a broad rather than a narrow construction to the end that it immunizes petitioners from contempt for refusing to answer any question which possibly would tend to disclose a protected source. However, in spite of such declaration, in my view the majority unduly has restricted the privilege in its application to the questions put to petitioners. Further, the majority has wrongly

upheld petitioners' contempt for refusing to answer questions which, while perhaps outside the privilege, clearly were beyond the subject matter of the inquiry. Finally, I believe that petitioners have a qualified First Amendment and California constitutional privilege of nondisclosure which gives added weight to section 1070 and required respondent to engage in a delicate balancing process before it could question petitioners as to the source of their information. For these reasons petitioners' contempt convictions should be reversed.

## LIMITED SCOPE OF INQUIRY

Because the statute is to be broadly construed, the scope of a "Farr" type hearing is necessarily limited. The limitation results from the following considerations: first, the word "source" in section 1070 must be defined to include not only the identity of any person who may have furnished information to the newsmen, but also the information itself in whatever form it may have been received. Thus, if a copy of the transcript was given to petitioners, the copy is a protected source and petitioners cannot be compelled to disclose whether they received a copy of the transcript, nor can they be required to produce it for examination. On the other hand, if the petitioners did not receive a copy of the transcript but someone read its contents to them over the telephone, any records pertaining to that communication, either in the form of a tape recording, notes, or other memoranda, would be a "source" within the privilege. This interpretation is supported by the language of subdivision (c) of section 1070 which provides that privileged "unpublished information" includes notes, out-takes, photographs, tapes or other data of whatever sort, whether or not information based upon or related to such material has been disseminated.[1] While there is no California case in point, the Pennsylvania Supreme Court in *In re Taylor* (1963) 412 Pa. 32 [193 A.2d 181, 7 A.L.R.3d 580] in interpreting a similar statute has held that the right of nondisclosure of a "source of any information" received by a newsman includes not only the identity of the person furnishing the information, but documents, inanimate objects and all other possible sources in whatever form it may be.

[1]Evidence Code section 1070 not only provides a privilege for refusing to disclose the source of any information used for publication, but also for refusing to disclose any unpublished information obtained or prepared in gathering, receiving or processing of information for communication to the public, and this is so whether or not published information based upon or related to such material has been disseminated. (Evid. Code, § 1070, subd. (c).)

Second, placing the burden on the newsman to prove that his answer will eventually lead to a disclosure of his source well may endanger the source and emasculate the privilege. This very problem was resolved by the United States Supreme Court in the context of the privilege against self-incrimination by holding that the witness need not satisfy the court that a criminal prosecution is likely to result from the answer because to do so might disclose the incriminating facts. It is enough that the witness simply shows a possible danger, even a *hypothetical one,* of incrimination. (Witkin, Cal. Evidence (2d ed. 1966) Witnesses, § 925, pp. 858-860.) The improbability of incrimination (in this case, the disclosure of a source) will not justify a denial of the privilege. "[I]f the witness, upon interposing his claim, were required to prove the hazard in the sense in which a claim is usually required to be established in court, he would be compelled to surrender the very protection which the privilege is designed to guarantee. To sustain the privilege, it need only be evident from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered *might be dangerous* because injurious disclosure *could result.*" (*Hoffman* v. *United States* (1951) 341 U.S. 479, 486-487 [95 L.Ed. 1118, 1123-1125, 71 S.Ct. 814, 818]; italics added.)

If a newsman is to be protected from a forced disclosure of any information which may tend to reveal a source of his story, it logically follows he cannot be compelled to reveal the form in which the information was received, the manner in which it was received, the time it was received, the place where it was received or which newsman received it. These questions cannot be answered, nor can the newsman give an intelligent explanation as to why they cannot be answered, without at least indirectly providing a clue or a link in the chain of evidence which would enable the interrogator to unlock the door to the source.

Third, to protect the privilege the newsman must avoid answering any questions which might result in an actual or constructive waiver of the privilege. By voluntarily answering questions as to some facts which would lead to the source, he will be held to have waived the privilege as to all other facts connected therewith. (See *Rogers* v. *United States* (1951) 340 U.S. 367 [95 L.Ed. 344, 71 S.Ct. 438, 442, 19 A.L.R.2d 378]; *In re Howard* (1955) 136 Cal.App.2d 816 [289 P.2d 537].) *Farr* is a clear example of such a waiver—by admitting that he had received the information from three persons subject to the court's order, Farr impliedly waived his right not to disclose their identities.

Fourth, because of the strong legislative policy behind section 1070 (majority opn., *ante,* pp. 217, 218) the broad definition of relevant evidence[2] cannot be utilized to restrict the privilege. Thus, even though an answer to a question might tend to exonerate a court officer from a suspicion of wrongdoing it is within the privilege if it also would tend to endanger a protected source.

The majority argues that questions "germane to the issue of any possible carelessness, indifference, neglect, connivance or collusion on the part of [court officers] in permitting the transcript to fall into the hands of petitioners" were relevant to the subject of the inquiry. Obviously, connivance or collusion on the part of a court officer would be pertinent because it would show a knowing violation of the order; however, mere carelessness, indifference or neglect, while perhaps tangentially relevant in that it indicates an absence of intentional wrongdoing by a court officer, nonetheless is within the privilege because it also might endanger a protected source. For example, if Mr. Goodwin "carelessly" left a copy of the transcript on his desk thus enabling a third party not subject to the order to transmit its contents to petitioners, forcing petitioners to answer questions concerning the episode would endanger the protected source.

Nor can I agree with the majority that because a question suggests possible criminal conduct by a petitioner and his source (apparently the theft of a public document) Evidence Code section 1070 does not apply. I find no authority for this proposition, and *Branzburg* v. *Hayes,* 408 U.S. 665 [33 L.Ed.2d 626, 92 S.Ct. 2646], does not so dictate. As stated by Justice White in his majority opinion: "The sole issue before us is the obligation of reporters to respond to grand jury subpoenas as other citizens do and to answer questions relevant to an investigation into the commission of crime." (408 U.S. at p. 682 [33 L.Ed.2d at pp. 639-640].) Again: "Although stealing documents or private wiretapping could provide newsworthy information, neither reporter nor source is immune . . . from testifying against the other, *before the grand jury or at a criminal trial.*" (408 U.S. at p. 691 [33 L.Ed.2d at p. 645]; italics added.) Thus, *Branzburg* had in mind only the giving of testimony by a newsman before a grand jury or at a pending criminal trial where his testimony would be relevant to the guilt or innocence of the person being investigated or charged with crime. Here, no such proceeding was in

---

[2]Evidence Code section 210 defines "relevant evidence" as evidence having any tendency in reason to prove or disprove a disputed fact that is of consequence to the action.

progress; the issue was not the guilt or innocence of petitioners or their source for violating a criminal statute.[3]

Moreover, the fact that Patterson had a master key to the courthouse at best raised an inference of criminal activity by Patterson or other representatives of the Bee which, if the trial court believed to be true, should have been turned over to the grand jury or the district attorney for investigation. As the majority acknowledges, it is not the function of a court to investigate a witness' possible criminal conduct nor is it contempt for a person to refuse to answer questions about matters over which the court has no jurisdiction or to which the testimony of the witness is neither pertinent nor material. (*State Bar of California* v. *Superior Court* (1929) 207 Cal. 323, 339-400 [278 P. 432].)

What all of this means is that once respondent questioned petitioners about whether they had received their information directly or indirectly from a person subject to the order and petitioners had fully answered these questions, pragmatically the *Farr* hearing came to an end. At this point, the court had two choices: either to accept the uncontradicted testimony or to reject it as untrue. If the court suspected that perjury had been committed, it should have turned the testimony over to the district attorney for a thorough investigation. Any suspected misrepresentation of fact by an attorney connected with the case could have been turned over to the State Bar for investigation.

Another very practical reason why the *Farr* hearing ends at this point is that it is exceedingly difficult if not impossible to frame a relevant question which, if not limited on its face to a court officer, cannot be construed to pertain at least indirectly to a protected source. Most of the questions in the appendix are within this category.

To the argument that this denouement places an undue restriction on the court's power to investigate the conduct of its officers and attachés, I respond that it is the only workable means of achieving an accommodation between the two competing interests without emasculating section 1070. The court's power of inquiry either must be limited as I have

---

[3]I have difficulty in perceiving the exact nature of the crime supposedly committed by petitioners. If they copied the contents of the transcript, a public document, while in a public office during working hours, there was no crime. (Code Civ. Proc., § 1888; Gov. Code, § 1227.) If they removed the transcript from a public office after hours there would be a trespass. However, the taking of a public document for the purpose of publishing its contents does not come within the traditional definition of theft; there is no intent to permanently deprive the owner, i.e., the public, of its property.

described it or it must be totally unrestricted as respondent believed it to be. The majority mistakenly has settled on a line somewhere between and has only deepened the sands of confusion.

Applying these rules to the questions in the appendix, Rosato questions Nos. 24, 25 and 26 and Patterson question No. 15 appear to be within the narrow exception to the privilege. The other questions to Rosato and Patterson, as well as the questions to Gruner and Bort, either are within the privilege or outside the scope of pertinent inquiry.[4] As to the four questions which should have been answered, in light of Patterson and Rosato's unequivocal testimony that neither they nor any Bee employee had obtained a copy of the transcript from any court officer or from any public office with the knowledge and consent of any of the persons covered by the order, I fail to see any sense in remanding the case so that they can answer these questions. Having in mind that "the good horse has been ridden to death," any remand would be an exercise in futility.

### CONSTITUTIONAL PRIVILEGE AND THE BALANCING PROCESS

Evidence Code section 1070 is backed by and must be construed in the light of a newsman's qualified privilege under both the First Amendment to the United States Constitution and article I, section 2 of the California Constitution.[5] Only by recognizing a constitutional privilege can the newsman's statutory right be fully protected. Justice Powell in his

---

[4]Rosato question No. 2, "Have you ever seen a copy of the grand jury transcript lying on Mr. Goodwin's desk, . . .?" is troublesome. On its face it appears to be harmless; it could be answered in the affirmative without endangering a source. If so answered, however, the next question would be, "When?" then, "Who else was present?" etc., thus narrowing the inquiry down to the point where a source could be endangered. The question is also confusing. If construed to mean did Rosato observe the transcript on Mr. Goodwin's desk in Goodwin's presence or with his knowledge, it would be pertinent to whether Goodwin violated the court's order. If the question is construed as referring to a time when Goodwin was not in his office and without his knowledge, it is not directly pertinent to whether Goodwin violated the order and, as previously explained, could lead to information which would indicate that a protected source aided Rosato in obtaining the transcript or its contents from Goodwin's desk. Rosato should not be forced to answer the question in its present form.

[5]In *Branzburg* Justice White observes that although Congress may determine privileges on the federal level, state legislatures are free within First Amendment limits to fashion their own standards, and state courts cannot be barred by the United States Supreme Court from "construing their own constitutions so as to recognize a newsman's privilege, either qualified or absolute." (408 U.S. at p. 706 [33 L.Ed.2d at p. 654, 92 S.Ct. at p. 2669].)

concurring opinion in *Branzburg* referred to a balancing between the freedom of the press and the newsman's obligation to testify: "The asserted claim to privilege should be judged on its facts by the striking of a proper balance between freedom of the press and the obligation of all citizens to give relevant testimony with respect to criminal conduct. The balance of these vital constitutional and societal interests on a case-by-case basis accords with the tried and traditional way of adjudicating such questions." (408 U.S. at p. 710 [33 L.Ed.2d at p. 656, 92 S.Ct. at p. 2671].)

Other courts since *Branzburg* have recognized the First Amendment privilege. In *State* v. *St. Peter* (1974) 132 Vt. 266 [315 A.2d 254], the Supreme Court of Vermont held that a newsman is entitled to refuse to answer inquiries put to him in a deposition proceeding unless the interrogator could demonstrate that there is no other adequately available source for the information and that the information is relevant to the subject matter of the inquiry, in that case the defendant's guilt or innocence. The court stated: "But the language and attitude of the *Branzburg* majority does not indicate an entire absence of concern for the news-gathering function so relevant to the full exercise of the First Amendment. The opinion confines itself to grand jury proceedings and trials. It declines to pass upon appearance of newsmen before other bodies or agencies. Even more noteworthy, the concurring opinion of Mr. Justice Powell suggests that the First Amendment supports enough of a privilege in news-gatherers to require a balancing between the ingredients of freedom of the press and the obligation of citizens, when called upon, to give relevant testimony relating to criminal conduct." (315 A.2d at p. 255.)

In *Brown* v. *Commonwealth* (1974) 214 Va. 755 [204 S.E.2d 429], the Supreme Court of Virginia in a case where a criminal defendant had subpoenaed a newsman to give testimony held that the testimony sought was not essential to a fair trial and upheld the privilege. In *Baker* v. *F. & F Investment* (2d Cir. 1972) 470 F.2d 778, the plaintiffs moved for an order compelling disclosure of a journalist's confidential news sources in a federal class action under the Civil Rights Act involving alleged racial discrimination in the sale of houses to Negroes. It was held that the First Amendment rights would not be yielded to compel disclosure of the newsman's confidential source where disclosure was not essential to protect the public interest in the administration of justice and disclosure did not go to the heart of the plaintiff's case. In commenting on *Branzburg* it was said: "Manifestly, the Court's concern with the integrity

of the grand jury as an investigating arm of the criminal justice system distinguishes *Branzburg* from the case presently before us. If, as Mr. Justice Powell noted in that case, instances will arise in which First Amendment values outweigh the duty of a journalist to testify even in the context of a criminal investigation, surely in civil cases, courts must recognize that the public interest in non-disclosure of journalists' confidential news sources will often be weightier than the private interest in compelled disclosure." (470 F.2d at pp. 784-785.)

In *Democratic National Committee v. McCord* (D.D.C. 1973) 356 F.Supp. 1394 the court noted the requirement of an alternate source for the information which the plaintiff sought to obtain from the subpoenaed newsman and held that the alternative sources had not been exhausted or even approached in the case before it. In *Cervantes v. Time, Inc.* (8th Cir. 1972) 464 F.2d 986, a libel case was dismissed on summary judgment despite the fact that the newsman-author of the allegedly libelous article had refused to reveal his confidential sources.

When the disclosure of a confidential source is sought in a proceeding other than a grand jury investigation or a pending criminal trial (where the newsman's testimony is essential to an adjudication of the guilt or innocence of the defendant), *Branzburg* contemplates a qualified privilege to be applied on an ad hoc basis. While to date the full dimensions of the privilege are uncertain, I submit that under the principles articulated in *Branzburg* and its progeny, respondent court should not have tried to force a disclosure of the source of petitioners' news stories without balancing the following relevant factors:

(1) The potential inhibition or chilling effect on future news stories (*Branzburg v. Hayes, supra,* 408 U.S. 665 [33 L.Ed.2d 626, 92 S.Ct. 2646]).

(2) The public interest served by disclosure—in this case to determine if a court officer had violated its order so as to deter future violations. In this regard the court should have considered and weighed the fact that at the time petitioners were questioned there was no substantial fair trial issue in the pending criminal prosecutions against Stefano, Aluisi and Bains. Stefano and Aluisi's cases already had been transferred to other venues for trial; while Bains' case was still pending in Fresno, the substance of the charges against him as reflected in the news stories had been published on several prior occasions and it was extremely doubtful that any material in the January 12, 13 and 14 news stories would have further prejudiced Bains in the eyes of prospective trial jurors in Fresno

County. This is particularly so when we consider the fact that Bains, a former City of Fresno Planning Commissioner, previously had been indicted and convicted in a widely publicized Fresno County jury trial in May of 1974, of three counts of selling heroin and one count of possessing heroin. He was under a state prison sentence for these crimes when indicted by the grand jury in October 1974. Any concern for Bains' right to a fair trial in Fresno County should have been considered chimerical at best.

(3) The existence of alternate sources for the information. The examination of the court officers showed that many persons not questioned had access to copies of the transcript. Having in mind the importance of the First Amendment privilege it seems only reasonable to require that before petitioners were forced to disclose any information concerning their sources that these other possible sources should have been explored.

(4) The relevance of the inquiry. As previously explained, the subject of the inquiry was whether a court officer knowingly had violated the order; it necessarily follows that respondent should have evaluated each question in light of this limitation. Only respondent was in a position to protect petitioners' interests by limiting the questions to those that were pertinent to the inquiry.

(5) The impact of the inquiry on the rights of others. Here the court should have considered the public's right to know the substance of certain portions of the grand jury transcript. In response to a question as to why the offending news stories were published, Mr. Gruner stated: "Well, we felt that there was an important public matter dealt with in all the articles because they were interrelated; one of the principal items being the possibility that the garbage franchise might be brought up before the City Council, and Mr. Stefano was a sitting member of that Council, and his testimony with regard to possible conflict of interest, we felt, was a significant matter of which the public was entitled to know. And the other articles dealt with the functions that the alleged activities of the public—of a public official, whose performance was entitled to be judged by the public that he serves, in the light of all facts that are known concerning his activities, and we, having weighed the factor of the right to a fair trial, felt that in this instance the rights of the defendants would not be impaired in that regard since the venue change had already been indicated in the case of two of the individuals and that the information with regard to the third defendant was not of significant

difference from material that had been published prior to the Grand Jury proceedings." Manifestly, the trial court should have weighed the public's right to know about Stefano's prior activities concerning matters then pending before the council, as evidenced by sworn testimony before the grand jury, a judicial body, against the court's need to force a disclosure of the source of the news story. The public's interest in knowing about this testimony should not have been ignored.

The record indicates that the respondent court failed to take any of these factors into consideration before it questioned petitioners. It simply ruled that under *Farr*, Evidence Code section 1070 was an "unconstitutional interference" with the court's investigative powers, and it had an unlimited right to ask any questions which would lead it to the source of the news stories, whoever or whatever the source might be.

Moreover, respondent should have reweighed the factors enumerated above after it had received petitioners' sworn testimony that they had not received any of their information directly or indirectly from any person subject to the order and before it broadened the inquiry to include the possible criminal conduct of petitioners. At this point, because there was no evidence suggesting that petitioners had obtained their information from anyone subject to the court order, in fact all of the evidence was to the contrary, respondent well might have concluded that any need to make further inquiry into petitioners' sources had ended. The court had fully accomplished its purpose of protecting the integrity of its judicial process.

The majority and dissenting opinions have assumed the validity of respondent's order sealing the transcript. However, I believe it is appropriate to note that a concern recently has been voiced by the American Bar Association's Legal Advisory Committee on Fair Trial and Free Press for the procedures generally used by a trial court in issuing restrictive orders re publication. In its preliminary draft of "Proposed Court Procedure for Fair Trial-Free Press Judicial Restrictive Orders" (July 1975), the committee states: "Until now the courts have rather uniformly treated any kind of restrictive order preventing disclosure and publication of information as outside of the procedural requirements applicable generally to the issuance of restraining orders and injunctions. Many restrictive orders across the country, in both state and federal courts, have been entered without notice and without hearing. In some instances, these orders have been issued on the eve of trials, or invoked orally during the trial. Generally no one has appeared

before the court to assert the free press right in the First Amendment. This results in orders being entered without a full exploration and understanding of the delicate balance between the constitutional requirements for a fair trial, a public trial, and a free press." (*Op. cit.* p. 2.)

Under the ABA committee's proposed procedure, law enforcement agencies, public defenders, district attorneys *and local news media* would receive notice of the proposed restrictive order accompanied by a notice giving the time within which written comments shall be received and the time for hearing any objections to the proposed order. (*Op. cit.* p. 9.) While any requirement that a trial court must give notice to the press with respect to restrictive orders on evidentiary matters arising during the course of a criminal trial would impose an unworkable burden on the trial court and unduly delay the progress of the trial, I suggest that such a rule would be beneficial to the courts and the public insofar as the issuance of any blanket pretrial injunction against publication of a grand jury transcript as in the present case. It must be kept in mind that often months and sometimes years pass before an indictment is brought to trial. There is something inherently wrong in allowing a court to prohibit the dissemination to the public of sworn testimony concerning misconduct by a public official who remains in office and votes on issues pertinent to the substance of the testimony without giving the public, through the press, the right to be heard on the matter. If such a procedure had been followed, respondent might have issued a limited order enjoining publication of only selected portions of the transcript but permitting publication of those portions pertinent to Mr. Stefano's continuing activities as a city councilman and which the public had the right to know about. I suggest our Supreme Court should consider promulgating such a rule which perhaps would tend to minimize future acrimonious controversies between the courts and the press.

In summary, petitioners' contempt convictions should be reversed for two reasons: first, with only four exceptions, the questions which they refused to answer exceeded the limited scope of permissible inquiry of whether a court officer or attaché violated the court's order. With the exceptions noted, the petitioners answered all pertinent questions in this area. Second, the respondent court failed to engage in the balancing process required to protect petitioners' constitutional and statutory privileges not to reveal the source of their news stories.

Petitioners' application for a hearing by the Supreme Court was denied November 20, 1975. Mosk, J., was of the opinion that the application should be granted.

## APPENDIX "A"

QUESTIONS WHICH JOE ROSATO REFUSED TO ANSWER

1. Are the passages in those articles which are set forth in quotation marks, in fact, direct quotations from that grand jury transcript?
ANSWER REQUIRED? Yes.
COMMENT: Question is preliminary in nature.
2. Have you ever seen a copy of the grand jury transcript lying on Mr. Goodwin's desk, Mr. Hugh Goodwin?
ANSWER REQUIRED? Yes.
COMMENT: Since Mr. Goodwin is a court officer, the answer may lead to identifying him as a violator of the orders. It does not endanger revealing the identity of protected sources not falling within the narrow exceptions to the broad protection afforded by the privilege. It is relevant to the negligence or other punishable conduct by court officers.
3. When you and Mr. Patterson were writing the stories marked Exhibits 2, 3, and 4, did you refer to the grand jury transcript?
ANSWER REQUIRED? Yes.
4. In writing those articles, did Mr. Patterson and in your presence refer to the grand jury transcript?
ANSWER REQUIRED? Yes.
5. Mr. Rosato, have you ever read the grand jury transcript?
ANSWER REQUIRED? Yes.
6. Did you ever see that transcript in the possession of Bill Patterson?
ANSWER REQUIRED? Yes.
7. From whatever the source, Mr. Rosato, are you the person who obtained the copy of the grand jury transcript used in writing the news articles referred to in Exhibits 2, 3, and 4?
ANSWER REQUIRED? Yes.
COMMENT: The answer to this question does not endanger the revelation of a source outside the range of court officers covered by the order but would either identify or not identify Rosato as the individual who obtained the grand jury transcript or information from the grand jury transcript used in the newspaper articles.
8. Mr. Rosato, did you arrange to obtain for the Bee a copy of the grand jury transcript from some outside source?
ANSWER REQUIRED? No.
COMMENT: This question is too broad and is protected by the privilege in that it endangers revealing the source outside the relatively small group of persons subject to the order and tends to narrow the field of inquiry vis-a-vis the protected sources.
9. To your knowledge, was a messenger used in transmitting a copy of the grand jury transcript to officers or employees of the Bee from an outside source?
ANSWER REQUIRED? No.
COMMENT: See comment under question No. 8.
10. Was the grand jury transcript obtained by you from the office of one of the persons or classes of persons mentioned, again going clear back to the defendants, without their knowledge or consent?
ANSWER REQUIRED? Yes.
COMMENT: See comment under question No. 2.
11. Was a copy of the transcript taken, to your knowledge, from a public office by an agent or employee of McClatchy Newspapers without knowledge or consent of the person having custody or control of that copy?
ANSWER REQUIRED? No.
COMMENT: If the question had been limited to the office of the person subject to the order it would have had to be answered. However, the term "public office" may

conceivably extend to some public offices and officers who were not subject to the order; hence it would endanger a source which is protected by the privilege.

12. Did you make or have you made a promise to the source of the grand jury transcript obtained by the Bee that the identity of the source would not be revealed?

ANSWER REQUIRED? No.

COMMENT: The question is immaterial, but petitioner has offered to answer this question.

13. To your knowledge, did the source, person from whom any grand jury transcript was obtained, make the initial contact offering that transcript?

ANSWER REQUIRED? No.

COMMENT: See comment under question No. 8.

14. Where were you when you first received a copy of the grand jury transcript?

ANSWER REQUIRED? No.

COMMENT: See comment under question No. 8.

15. Did you first come into possession of a copy of the transcript in the Fresno County Courthouse?

ANSWER REQUIRED? No.

COMMENT: See comment under question 8. Note, if the question had been restricted to one of the offices of the persons subject to the order it should have been answered.

16. When did you first come into possession of a copy of the grand jury transcript?

ANSWER REQUIRED? Yes.

COMMENT: Question is preliminary.

17. When did you first come into possession of a copy of those statements which are enclosed in quotation marks and contained in Exhibits 2, 3, and 4?

ANSWER REQUIRED? Yes.

COMMENT: Question is preliminary.

18. Yes, you did, Mr. Rosato, and that declaration, I think, will show that it was stated that at the time you signed the declaration you did not have a copy of the transcript in your possession or under your control, but I ask you now, under oath, have you ever had a copy of the grand jury transcript in your possession or under your control?

ANSWER REQUIRED? Yes.

19. To your knowledge, does anyone employed or associated with McClatchy Newspapers now have a copy of the grand jury transcript?

ANSWER REQUIRED? Yes.

20. Have you ever been in the office of the Public Defender at a time when that office was not open to the public?

ANSWER REQUIRED? Yes.

COMMENT: See comment under question No. 2.

21. Have you ever been in the office of the District Attorney when that office—at a time when that office was not open to the public?

ANSWER REQUIRED? Yes.

COMMENT: See comment under question No. 2.

22. Have you, including the office of the County Clerk, have you ever been in the office of any of the classes of persons mentioned awhile ago which you've stated you recall, at a time when those offices were unoccupied by anyone else?

ANSWER REQUIRED: Yes.

COMMENT: See comment under question No. 2.

23. Did you obtain a copy of a grand jury transcript after you were served with the subpoena I showed you just before the noon break?

ANSWER REQUIRED? No.

COMMENT: Question is irrelevant.

24. If I can repeat it, has any officer or employee of the Bee told you, in effect, that he personally took a copy of the grand jury transcript from any of the persons in that class of persons we have discussed earlier?

ANSWER REQUIRED? Yes.

COMMENT: See comment under question No. 2.

25. Have you seen any employee take a copy of the grand jury transcript from the office of any of the persons mentioned in that class of persons?

ANSWER REQUIRED? Yes.

COMMENT: See comment under question No. 2.

26. Do you know whether or not any employee of the Bee has obtained a copy of the transcript from any of the persons mentioned in that class of persons?

ANSWER REQUIRED? Yes.

COMMENT: Rosato has offered to answer this question.

## QUESTIONS WHICH WILLIAM K. PATTERSON REFUSED TO ANSWER

1. Had he [Rosato] acquired any materials helpful in writing stories stated there in Exhibits 2, 3 and 4, which caused you to ask for his help?

ANSWER REQUIRED? Yes.

2. Are any of the statements contained in quotation marks in Exhibits 2, 3, and 4 quotations from the grand jury transcript?

ANSWER REQUIRED? Yes.

3. Have you, on any occasion other than what you've already described, seen a copy of the grand jury transcript?

ANSWER REQUIRED? No.

COMMENT: See comment to Rosato question No. 8.

4. Have you read the grand jury transcript?

ANSWER REQUIRED? Yes.

5. Have you read any portion of it [grand jury transcript]?

ANSWER REQUIRED? Yes.

6. Have you ever had the transcript in your possession?

ANSWER REQUIRED? Yes.

7. When you and Mr. Rosato were jointly writing the stories, Exhibits 2, 3, and 4, did you refer to a copy of the transcript?

ANSWER REQUIRED? Yes.

8. When you had completed writing Exhibits 2, 3, and 4, what did you do with any materials used in writing those matters which are contained in those news articles in quotation marks?

ANSWER REQUIRED? No.

COMMENT: The question is too broad. It may require an answer which would compel a revelation that the transcript was returned to a protected source.

9. As between you and Mr. Rosato, who first acquired the material used in writing those statements contained in the exhibits last mentioned in quotation marks?

ANSWER REQUIRED? Yes.

10. From whatever the source, are you the person who obtained the materials which are contained in those news articles in quotation marks?

ANSWER REQUIRED? Yes.

COMMENT: See comment to Rosato question No. 7.

11. Was a copy of the grand jury transcript obtained from a source outside the Bee through your efforts?

ANSWER REQUIRED? No.

COMMENT: See comment to Rosato question No. 8.

12. Did Mr. Rosato obtain a copy of the grand jury transcript to your knowledge?

ANSWER REQUIRED? Yes.

COMMENT: See comment to Rosato question No. 7.

13. To your knowledge, was more than one copy of a grand jury transcript obtained by officers or employees of the Bee from outside sources?

ANSWER REQUIRED: Yes.

14. Do you know how the materials used in writing those statements contained in quotation marks in those news articles was obtained for the Bee?

ANSWER REQUIRED? No.

COMMENT: See comment to Rosato question No. 8.

15. Has any employee of the Bee told you, in effect, that he personally took a copy of the grand jury transcript from the office of any of the persons or classes of persons mentioned a moment ago?

ANSWER REQUIRED? Yes.

COMMENT: See comment under Rosato question No. 2.

16. Has Mr. Rosato told you, in effect, that he obtained a copy of the grand jury transcript from the office of one of those persons or classes of persons without their knowledge or consent?

ANSWER REQUIRED? Yes.

COMMENT: See comment under Rosato question No. 2.

17. Have you seen an officer or employee of the Bee take a copy of the grand jury transcript from the office of one of the persons or classes of persons mentioned a moment ago without the knowledge or consent of such person or class of persons?

ANSWER REQUIRED? Yes.

COMMENT: See comment under Rosato question No. 2.

18. Has any officer or employee of the Bee told you that within the last three months he was in Mr. Goodwin's office when Mr. Goodwin was not present?

ANSWER REQUIRED? Yes.

COMMENT: See comment under Rosato question No. 2.

19. Has Mr. Rosato told you that within the last three months he has been in Mr. Goodwin's office at a time when no one else was present?

ANSWER REQUIRED? Yes.

COMMENT: See comment under Rosato question No. 2.

20. To your knowledge, has any promise been made to the source of the grand jury transcript in the possession of the Bee that the identity of the source would not be revealed?

ANSWER REQUIRED? No.

COMMENT: The question is immaterial.

21. Where did you first see it [the grand jury transcript]?

ANSWER REQUIRED? No.

COMMENT: See comment under Rosato question No. 8.

22. Were you in a public office, that is, the office of a public officer when you first came into possession of the statements contained in quotation marks and contained in those exhibits, 2, 3, and 4?

ANSWER REQUIRED? No.

COMMENT: The question would have been proper if it had been restricted to the office of a public officer who was subject to the orders.

23. When did you last have in your possession or under your control a copy of the materials used in writing the matters which are contained in quotation marks in those articles?

ANSWER REQUIRED? Yes.

24. When you completed writing the news articles Exhibit 2, 3, and 4, what did you do with the document used in writing the matter contained in those quotation marks and those articles?

ANSWER REQUIRED? No.

COMMENT: See comment under question No. 8.

25. To your knowledge, does anyone employed or associated with McClatchy Newspapers now have a copy of the grand jury transcript?

ANSWER REQUIRED? Yes.

## QUESTIONS WHICH GEORGE GRUNER REFUSED TO ANSWER

1. Have you read a copy of the grand jury transcript?
ANSWER REQUIRED? Yes.

2. Do you have in your possession or under your control now a copy of the grand jury transcript?
ANSWER REQUIRED? Yes.

3. Did you bring with you to court today a copy of the grand jury transcript, of any copy of a grand jury transcript in your possession or under your control?
ANSWER REQUIRED? Yes.

4. Mr. Gruner, do you know who obtained for the Bee a copy of the grand jury transcript, who within your organization?
ANSWER REQUIRED? Yes.

5. Do you have a copy of the materials used by Mr. Patterson and Mr. Rosato in writing the news articles marked Exhibits 2, 3, and 4?
ANSWER REQUIRED? Yes.

## QUESTIONS WHICH JAMES H. BORT, JR., REFUSED TO ANSWER

1. Was the source material in the form in which it was first acquired by an officer or employee of McClatchy Newspapers in Xerox copy form?
ANSWER REQUIRED? Yes.

2. When did you first see the source material?
ANSWER REQUIRED? Yes.

3. When did you last see the source material?
ANSWER REQUIRED? Yes.

4. Did the source material in the form in which it was obtained contain any underlining—?
ANSWER REQUIRED? Yes.

5. Did the source material in the form in which it was obtained contain any marginal notations?
ANSWER REQUIRED? Yes.

6. Did the source material in the form in which it was obtained contain any handwriting or pen or pencil markings of any kind?
ANSWER REQUIRED? Yes.

7. Was written source material used in writing Exhibits 2, 3 and 4?
ANSWER REQUIRED? Yes.

8. Did you see the source material before those news articles, Exhibits 2, 3 and 4, were written?
ANSWER REQUIRED? Yes.

9. Was the Bee's first copy of the source material made in the Fresno County courthouse?
ANSWER REQUIRED? No.
COMMENT: See comment to Rosato question No. 11.

10. Was the Bee's first copy of the source material made on a county copy machine with knowledge or consent of a county employee?
ANSWER REQUIRED? No.
COMMENT: See comment to Rosato question No. 11.

11. Was the source material first obtained by an officer or employee of McClatchy Newspapers between 8:00 o'clock a.m. and 5:00 o'clock p.m. on a weekend or on a weekend?
ANSWER REQUIRED? Yes.

12. Was a copy of the grand jury transcript used in writing Exhibits 2, 3 and 4?
ANSWER REQUIRED? Yes.

13. Who in your organization last had the source materials, according to your

information?

ANSWER REQUIRED? Yes.

14. After writing Exhibit 2, 3 and 4 articles, did Mr. Rosato or Mr. Patterson turn the source material over to you?

ANSWER REQUIRED? Yes.

15. Do you know whether or not Mr. Patterson had in his possession or under his control a copy of the source material at the time he was served with the subpoena duces tecum prior to the January 24, 1975 hearing in this matter?

ANSWER REQUIRED? Yes.

16. Do you know whether or not Mr. Rosato had in his possession or under his control a copy of the source material at the time he was served with a subpoena duces tecum prior to the January 24, 1975 hearing in this matter?

ANSWER REQUIRED? Yes.

17. Do you know whether or not Mr. Gruner had in his possession or under his control a copy of the grand jury transcript at the time he was served with the subpoena duces tecum prior to the January 24, 1975 hearing in this matter?

ANSWER REQUIRED? Yes.